In the Matter of the Claim of Seymour B. Berson, Respondent. Edward Corsi, as Industrial Commissioner, Appellant.

Third Department, December 22, 1953.

*Nathaniel L. Goldstein, Attorney-General (Francis R. Curran and Wendell P. Brown* of counsel), for appellant.

*Seymour B. Berson,* respondent in person.

HALPERN, J. The question here presented is the construction of paragraph (d) of subdivision 2 of section 517 of the Labor Law as added by chapter 792 of the Laws of 1951.

Subdivision 2 of section 517 deals with exclusions from the coverage of the Unemployment Insurance Law (Labor Law, art. 18). The exclusions are accomplished in an indirect fashion by excluding certain types of payments from the definition of the term " remuneration ". " Remuneration " is one of the key words in the determination of the claimant's right to unemployment insurance benefits (Labor Law, § 517) and in the determination of the employer's duty to make contributions (§ 518, subd. 1; § 570, subd. 1).

Subdivision 2 of section 517 was amended by chapter 792 of the Laws of 1951 to read in part as follows:

" 2. Exclusions. Remuneration does not include: * * * (d) Compensation paid by a corporation to an employee who is a principal stockholder in that corporation. Principal stockholder means one who owns twenty-five percentum or more of the capital stock of the corporation."

We are called upon to determine the meaning of this amendment, in its application to an undisputed set of facts. The claimant was the vice-president and sales manager of the Technicraft Optical Products, Inc., from March, 1951, to July 18, 1952. On the latter date, the corporation went out of business. Shortly thereafter, the claimant filed a claim for unemployment insurance benefits.

The corporation was authorized to issue both preferred and common stock. At the time the claimant entered the employ of the corporation, he became the owner of 12.4% of the outstanding common stock and 25.1% of the preferred stock, thus being the owner of 17.5% of the combined outstanding common and preferred stock. On October 15, 1951, the claimant gave up part of his preferred stock and acquired additional common stock; as a result, he became the owner of 25% of the common stock and 19.5% of the preferred stock, owning 22.8% of the combined outstanding common and preferred stock.

Under the terms of the certificate of incorporation, the preferred stock had no voting rights; the voting rights were vested exclusively in the holders of the common stock.

The Industrial Commissioner maintained that on and after October 15, 1951, the claimant was a principal stockholder within the meaning of paragraph (d) of subdivision 2 of section 517, the commissioner interpreting the words " twenty-five percentum or more of the capital stock " to mean 25% of the voting stock. Therefore, the commissioner held, the wages received by the claimant after October 15, 1951, did not constitute " remuneration " within the meaning of the statute and, since upon the exclusion of these wages the claimant would not have earned an average of $15 or more per week for at least twenty weeks during the fifty-two-week period preceding the filing of his claim (Labor Law, § 527), the commissioner held that the claimant was ineligible for unemployment insurance benefits.

The unemployment insurance referee and the Appeal Board overruled the commissioner's determination and decided in favor of the claimant. They held that there was no basis in the statute for construing the words " twenty-five percentum or more of the capital stock " to mean the voting stock only and since, taking all the outstanding stock into account, the claimant's ownership was less than 25%, they held that the claimant was eligible for benefits.

The Unemployment Insurance Appeal Board was plainly right in deciding that there was no basis in the statute for holding that only the voting stock was to be taken into account in determining whether the case came within the exclusionary provision of the statute.

" Capital stock " in its strict and proper sense means " the amount of capital contributed by the members for corporate purposes " (*Rensselaer Co. Agricultural & Horticultural Soc.* v. *Weatherwax*, 255 N. Y. 329, 331; 18 C. J. S., Corporations, § 193, p. 614). When used with reference to the outstanding shares of stock, the term " capital stock " embraces all classes of stock. There is nothing on the face of the statute to indicate that the Legislature did not use the term " capital stock " in its ordinary and accepted sense.

Even if we assume that, with the assistance of extraneous materials, it could be established that the Legislature meant to refer only to voting stock, it is beyond our power to so alter the statute. To interpose the adjective " voting " before the words " capital stock " would be, not to construe the statute, but to rewrite it.

Our inquiry is not in the abstract what the Legislature intended but rather what meaning we can reasonably give to the words which the Legislature used. "Thereupon we ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used". (Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417; Holmes, Collected Legal Papers, pp. 203, 204.)

As the Court of Appeals said in *Meltzer* v. *Koenigsberg* (302 N. Y. 523, 525): "The language found in the statute is clear and unambiguous, and, as this court long ago declared, and frequently repeated, in the construction of statutes, the intent of the framers ' is to be sought first of all, in the words and language employed, and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. * * * Courts cannot correct supposed errors, omissions or defects in legislation * * *.' (*McCluskey* v. *Cromwell*, 11 N. Y. 593, 601–602; see, also, *Matter of Rathscheck*, 300 N. Y. 346, 350.)"

Furthermore, even if it were permissible for us to go beyond the words of the statute in the circumstances here presented, it is far from clear, from the legislative history brought to our attention by the Attorney-General, that the Legislature intended to make the ownership of 25% of the voting stock the sole criterion in determining who is a "principal stockholder" under the statute.

The memorandum submitted by the assemblyman who introduced the bill (New York State Legislative Annual, 1951, p. 276) is, at best, inconclusive. The memorandum uses the words "25% or more of the capital stock", the same words as those which appear in the statute. There is no reference in the memorandum to voting stock or to voting rights.

The memorandum gave, as an illustration of the evil which the statute was intended to remedy, the abuse of unemployment insurance by the owners of corporations operating summer hotels. In a typical case, as stated in the memorandum, the stock of the corporation was owned by three or four members of a single family; the stockholders were also employees of the corporation and when the hotel closed after the season, the

stockholder-employees applied for and obtained unemployment insurance benefits, although they had been "to all intents and purposes self-employed". It is true that in the case put in the memorandum the stockholders had voting control of the corporation but the control was vested in the family as a unit rather than in any one stockholder. Obviously, a stockholder-employee who owns 25% of the stock (even in the case of a corporation which has only one class of stock, all voting, outstanding) does not have voting control unless the rest of the stock or a major block of it is owned by other members of his family or by other persons subject to his influence or control. The Legislature apparently chose the 25% figure as representing a substantial ownership interest in the enterprise, which it assumed was controlled by a single family or other closely associated group. If we were to read anything into the statute on the basis of the legislative history, it would be a requirement that it be shown that, in addition to owning 25% of the stock, the stockholder-employee was in a position to control the affairs of the corporation. From this standpoint, the exact nature of the 25% stock interest is not important. Nonvoting common stock would give the stockholder-employee just as great a share of the profits of the corporation enuring to the equity owners as voting stock and it would be just as objectionable to allow him to take advantage of the Unemployment Insurance Law, if in fact through the stockholdings of members of his family or others, he had the power to control the corporation's affairs. In this connection, it may be useful to compare with the statute before us, subdivision (b) of section 24 of the Internal Revenue Code (U. S. Code, tit. 26, § 24, subd. [b]) which provides that no deduction shall be allowed for a capital loss upon a sale of property between an individual and a corporation "more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual" and which further provides that "An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family", as defined in the statute.

It is apparent that while the Legislature had a definite objective in mind, it had not thought the problem through to the point of determining the best method of attaining its objective. Much work remains to be done in order to make this incomplete statute into an effective and equitable instrument of carrying out the Legislature's intention. Simply changing the words "capital stock" to "voting stock" in the statute is not enough.

The Legislature apparently had in contemplation in drafting the statute only a corporation with a simple capital structure, all or most of the stock of which was owned by a single family. The Legislature did not address itself to the question of how the disqualifying interest ought to be determined in the case of a corporation with a complicated capital structure or in the case of a corporation whose stock is owned by independent or nonassociated stockholders.

Only the Legislature can decide how these problems should be solved. For the court to undertake the task '' is to usurp a power which our democracy has lodged in its elected legislature '' (Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. Rev. 527, 533). '' A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration '' (*Lawrence Constr. Corp.* v. *State of New York,* 293 N. Y. 634, 639).

The Legislature has already found it necessary to make one change in the provision enacted by chapter 792 of the Laws of 1951, in order to avoid an inequitable result. Under the statute as originally adopted, if a corporation had eight or more employees, it was required to pay the Federal unemployment tax upon the first $3,000 of the wages paid to stockholder-employees, even though they were barred from receiving unemployment insurance benefits under the State statute because of their ownership of more than 25% of the stock of the corporation. The statute was amended in 1953 so that the exclusionary provision of paragraph (d) of subdivision 2 of section 517 is not applicable, if the corporation is required to pay a Federal unemployment tax with respect to the compensation paid to the stockholder-employee (L. 1953, ch. 461). The scope of the exclusionary provision is now limited to corporations with fewer than eight employees.

It should be noted that at the time the Legislature re-enacted the provision in 1953 in connection with making this change, it re-enacted the language of the original text using the term '' twenty-five percentum or more of the capital stock ''. At that time, the unemployment insurance referee and the Appeal Board had already held that the term embraced all the stock and was not limited to voting stock. If the Legislature had desired to override this administrative construction, it could easily have done so at the time of the adoption of the 1953 amendment.

The Industrial Commissioner argues that his view should be regarded as the administrative construction. He argues that his construction is entitled to the weight to be given to the interpretation of statutory terms by " the agency administering the statute ", citing *Matter of Mounting & Finishing Co.* v. *McGoldrick* (296 N. Y. 104, 108). But under the peculiar setup in the administration of the Unemployment Insurance Law, we must regard the interpretation adopted by the Unemployment Insurance Appeal Board, rather than the view of the Industrial Commissioner as the prevailing administrative interpretation. The statute vests in the Unemployment Insurance Appeal Board the final power of decision subject only to judicial review. Section 623 of the Labor Law provides: " A decision of a referee, if not appealed from shall be final on all questions of fact and law. A decision of the appeal board shall be final on all questions of fact and, unless appealed from, shall be final on all questions of law."

If the doctrine of the *Mounting & Finishing Co.* case is to be applied to the terms used in the Unemployment Insurance Law, it is the interpretation by the Appeal Board which is to be accorded special weight by the courts.

The decision of the Unemployment Insurance Appeal Board should be affirmed, without costs.

FOSTER, P. J., BERGAN, COON and IMRIE, JJ., concur.

Decision of the Unemployment Insurance Appeal Board affirmed, without costs.