DEFIANCE MILK PRODUCTS Co., Respondent, *v.* C. CHESTER DU MOND, as Commissioner of Agriculture and Markets of the State of New York, Appellant.

Third Department, December 28, 1954.

*Robert G. Blabey* and *George G. Fiesinger* for appellant.

*David S. Williams* for respondent.

IMRIE, J. Subdivision 2 of section 64 of the Agriculture and Markets Law of this State reads, " No person shall sell or exchange, or offer or expose for sale, or exchange, any condensed or evaporated skimmed milk, except it be in containers or packages containing ten pounds avoirdupois net weight or more, which containers or packages shall be distinctly labeled, branded or marked in block letters not less than one-half inch in height, with the words ' Condensed Skimmed Milk ' or ' Evaporated Skimmed Milk ' ". Plaintiff has brought action for a judgment declaring unconstitutional, invalid and void that portion of the section which prohibits the sale of evaporated skimmed milk except in containers holding ten pounds or more.

Plaintiff is an Ohio corporation manufacturing evaporated milk, evaporated skimmed milk, and other dairy products in Ohio and Illinois. It began distributing evaporated skimmed milk packaged in fourteen and one-half ounce containers in 1950 and that year sold 27,000 cases of forty-eight containers. In 1951 it sold 103,000 cases and in 1952 about 143,000 cases.

The article here under consideration is produced by removing from fresh cows' milk substantially all of the butterfat and by then reducing its volume, by means of a vacuum process, to a ratio of about 1 to 2.3, with the addition of vitamins in place of those said to be removed with the fat in the skimming process.

Plaintiff began shipping the milk to wholesalers in this State in 1951. It was advised by the Department of Agriculture and Markets that the sale was in violation of subdivision 2 of section 64, following which sales were discontinued and the goods recalled. This action was instituted subsequently and, after issue was joined, plaintiff moved for summary judgment. The motion was denied by order of Special Term and an appeal from that order was taken to this court. (See *Defiance Milk Products Co.* v. *Du Mond,* 282 App. Div 977.) In our decision it was said (p. 978), " The matter should not be determined until all of the background and history of the legislation is before the court." The action was then tried before Hon. CHRISTOPHER J. HEFFERNAN, Official Referee, and judgment

entered on his decision in favor of the plaintiff. This appeal is taken from that judgment.

Statutes enacted under the police power, as was this law, are presumed to be constitutional, but the presumption is one of fact and rebuttable. '' When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts '' but '' immunity [is not] achieved by treating any fanciful conjecture as enough to repel attack.'' In case of a challenge to its validity '' one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary.'' (*Borden's Co.* v. *Baldwin,* 293 U. S. 194, 209.)

Nor is it questioned that traditional principles of court inquiry into the constitutionality of such statutes are applicable. We need not labor the point that, in the exercise of the police power, broad discretion resides in the Legislature in deciding what is required in the interest of the public and the kind of measures necessary to protect such interests. What interest of the public was sought to be protected by this statute? Does its requirement have a real and substantial relation to the protection of that interest or, generally, to the protection of the health, safety, morals or general welfare of the public? (*People ex rel. Pinello* v. *Leadbitter,* 194 Misc. 481, affd. 275 App. Div. 864, affd. 301 N. Y. 695.)

By stipulation of the parties, the healthfulness of the product is not in question. Plaintiff does not question, and the markings on its containers conform to, the mandate of the law. Thus the issue here is limited to the requirement that evaporated skimmed milk be sold only in packages containing ten or more pounds. This law was a part of the former Farms and Markets Law (L. 1922, ch. 48). Appellant urges that the purpose was to protect the public interest against fraud and deceit in the sale of evaporated skimmed milk in containers similar to those used in the sale of evaporated milk. It does not appear to have been possible to provide the background and history of the enactment to conform to the suggestion of this court in the earlier proceeding. In an attempt to supply some historical data, defendant was permitted on the trial to put into evidence affidavits used on the motion for summary judgment. In an answering affidavit, Kenneth F. Fee, Director of Division of Milk Control, referred to his attendance at a legislative hearing in 1922, at which there were testimony and discussion of the

question of deceit. He stated that a woman testified that she had asked for a can of evaporated milk in an Albany store and received a can of evaporated filled milk. He averred that a reading of section 64 clearly demonstrates that, as a result of the amendment, the prohibition of "such products" in containers similar to those in which evaporated milk is customarily sold was intended.

It should be noted that we are not here concerned with "filled" milk, skimmed or otherwise. That product is not defined in our statute except as it is naturally included in the definitions of adulterated milk. (Agriculture and Markets Law, § 46.) It is defined in a Federal statute as "any milk * * * or skimmed milk * * * to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk". (U. S. Code, tit. 21, § 61, subd. [c].) It is there declared to be an adulterated article of food, injurious to public health, and its sale a fraud upon the public. Its manufacture is prohibited in any Territory, possession or the District of Columbia, as well as its shipment or delivery for shipment in interstate or foreign commerce. (U. S. Code, tit. 21, §§ 61, 62.) *United States* v. *Carolene Products Co.* (304 U. S. 144), cited by appellant, found for the constitutionality of that statute and thus was concerned with filled milk only.

The difference between whole milk and evaporated milk and between skimmed milk and evaporated skimmed milk is, in each case, a matter of water content. If, in 1922, when this statute was enacted, or since, there existed a "state of facts reasonably * * * [to] be conceived that would sustain it [other than the somewhat chimerical fear of confusion leading to fraud and deceit]," (*Borden's Co.* v. *Baldwin,* 293 U. S. 194, 209) it must relate in some manner to the difference between whole and skimmed milk. That, essentially, is the basis of appellant's argument. No question has been raised about the sale of evaporated milk in convenient small containers. No other reason than possible confusion is urged against similar merchandising of the skimmed product.

Skimmed milk is a recognized food product. The record asserts that it retains all the minerals and other essentials of milk other than the fat, is low in fat and calories, and is useful to a person on a diet. These, we believe, are now matters of common knowledge. Dr. Edward J. Stieglitz, of Washington, D. C., has said, "Unfortunately, the majority of older persons

dislike or resent the prescription of milk. Milk is not only a valuable source of protein but also a major source of calcium. Skim milk may be preferable to whole milk as a source of extra protein, especially if one wants to avoid increasing the fat intake. Dried skim milk preparations, particularly those fortified with additional iron and vitamins, are of considerable value in the maintenance of good nutrition in the senile person.'' That statement was in an article confined to nutritional needs in diseases of old age and did not purport to exclude consideration of the health values of skimmed milk to other than elderly people. (Stieglitz, '' Nutrition Problems of Geriatric Medicine '', The Journal of the American Medical Association, Vol. 142, No. 14, April 8, 1950, p. 1070.)

It is also a matter of common knowledge or readily ascertainable that skimmed milk is obtainable from one's milkman in bottles distinguishable from those containing whole milk only by the wording on the small cap at the bottle top. No one suggests that such similarity in containers demonstrates a tendency to deception and fraud. The experience of plaintiff demonstrates the existence of a large and growing demand for the evaporated form of skimmed milk packaged in small containers.

We do not question the legislative power to assure a minimum of nutritive elements in a widely used article of food and to protect the public from fraudulent substitutes. (*U. S.* v. *Carolene Products Co.,* 304 U. S. 144, 148, *supra.*) Nor is it questioned that, at least in cases involving substitute products, the power has been sustained over the contention that the substitute may be or is as wholesome and useful as the simulated article. We do emphasize, however, that the recognized value of skimmed milk and the evident wide demand for it serve to throw into sharp contrast the complete absence of any showing of a reason justifying the legislation in question or that that product can be considered as a fraudulent substitute for anything else.

Furthermore, though we assume the power of the Legislature in 1922, to enact a law which would, in effect, prohibit the sale of evaporated skimmed milk at retail, it remains necessary to consider the statute in the light of its present effect upon sales practice when its enforcement is being sought. A century ago some people of sense thought tomatoes were poisonous, but it would not now be seriously argued that legislation of that period prohibiting their sale could be sustained today in the light of the present regard for them. A '' police regulation,

although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation.'' (*Abie State Bank* v. *Bryan,* 282 U. S. 765, 772; *Nashville, C. & St. L. Ry.* v. *Walters,* 294 U. S. 405, 415.)  A half century ago skimmed milk was treated as a by-product of milk production, inferior in character.  Now it is recognized as a dietary component because of its retention of proteins and of the reduction of fat and calorie content.  Its value is thoroughly and widely understood. We can see no present-day justification for preventing the average man or woman from buying it as conveniently as evaporated whole milk, on the one hand, or skimmed fluid milk, on the other.  In our view the enforcement of this 1922 statute in this period of greatly changed conditions is unreasonable and arbitrary.

We do not agree that the testimony for the defendant demonstrates the asserted tendency to fraud and deceit.  His several investigators, employees of the Department of Agriculture and Markets, '' shopped '' in stores in this and neighboring States. Their procedure is indicative of an effort to be fooled.  It is a reasonable inference that they were disinterested in observing, in the stores, whether the clerks wrapped the articles called for or, even, whether the orders were clearly understood.  Not until they were out of the stores did they open the packages to see if they had been correctly served.  On the trial it was clear that they had no trouble reading and understanding the half-inch letters of the markings on plaintiff's cans.

There appears no reasonable basis for the law.  It must be deemed an invasion of plaintiff's rights as arbitrary, unreasonable and discriminatory, and as not reasonably related to the protection of the public from fraud or otherwise.  On the other hand, it may be said to operate against the public interest, as a disservice to those persons desiring or required to use skimmed milk, but who prefer to purchase it in evaporated form by reason of economic necessity, convenience, or otherwise.  Now they must buy it in ten pound containers, with the consequent inconvenience of handling and storage, extra financial outlay, and the possibility of waste because so large a quantity cannot be used while it is fit for consumption.

Appellant urges the further contention that plaintiff has no standing to challenge subdivision 2 of section 64 because its product is neither milk nor skimmed milk by the legislative standard, but is an adulterated milk, the sale of which is prohibited by section 50 of the Agriculture and Markets Law.  The claim of adulteration is predicated upon plaintiff's testimony

relating to the addition of vitamins to its milk for the purpose of restoring vitamins said to be removed in the skimming process. We do not concur with this view.

Eight statutory definitions of adulterated milk are found in section 46 of the statute. The two which might be applicable to this inquiry are contained in paragraphs 7 and 8. Paragraph 7 classes as adulterated milk that " from which any part of the cream has been removed ". Paragraph 8 describes as adulterated any milk " which has been *diluted* with water or any other fluid, or to which has been added or into which has been introduced any *foreign substance* whatever." (Italics supplied.) In general usage, adulterate is " 2. To corrupt, debase, or make impure by an admixture of a foreign or a baser substance; to prepare, esp. for sale, with one or more ingredients included which are not part of the professed substance; as, to *adulterate* food, drink, drugs, coin, etc. * * *. 3. Figuratively, to make corrupt or impure by adding new, strange, or foreign elements." (Webster's New International Dictionary [2d ed.].)

Subdivision 1 of section 64 states, " The prohibitions contained in this article against the sale of adulterated milk shall not apply to skimmed milk as defined in section forty-six, which is unadulterated, except by skimming, if it is sold for and as skimmed milk." Section 46 defines the term " skimmed milk " as milk " from which part or all of the cream has been removed ".

Plaintiff's milk is and " is sold for and as skimmed milk." That fact cancels out the application of paragraph 7 of section 46 describing the removal of cream as adulteration.

Plaintiff's president testified that the added " vitamin A is in the form of a concentrated oil and the vitamin $D_3$ comes to us in a concentrate already mixed with milk." If the end product is adulterated, it is so by reason of the fact that the added vitamins are foreign substances (§ 46, par. 8) or are new, strange or foreign elements which corrupt, debase or make the milk impure by an admixture. Such a conclusion is not sustained by the record before us.

The judgment should be affirmed, with costs to respondent.

BERGAN, J. (concurring). I concur fully in the opinion of Mr. Justice IMRIE and I make these additional observations:

Although the court has gone very far in upholding statutes and administrative regulations affecting the merchandising of food, there must, at bottom, be something rational about the direction the control takes.

In its present-day application the effect of the 1922 statute on the current sale of canned evaporated skimmed milk shows no rationality. It is stipulated that the " healthfulness of the products in question " is not in issue.

The statute itself provides a specific device to prevent mistaking this product from canned whole evaporated milk by making directions as to the size and type of labeling; and it is not disputed that plaintiff complies exactly with this direction.

What is left is the size of the can; and it is not demonstrated residually how this could rationally be related to the healthfulness of the product, which is out of the case, or to questions of deception where the statute has provided a way, which has been followed, to avoid deception.

After hearing the evidence adduced on the trial the Official Referee found specifically that " there is no proof in this record to sustain a charge of fraud or deception ". He concluded that " no one can be deceived ". The defendant's witnesses called on this subject demonstrated readily that there would not be the slightest difficulty in distinguishing this product from evaporated whole milk if the statutory direction for labeling were followed.

Nothing in the record sustains the remnant of rationality urged for the statute that it would avoid actual confusion. A housewife able to read a plain and large label — and this is the regular pursuit of every housewife who shops for family food — could not be diverted from what she wanted or confused into buying what she did not want by any of this. Certainly differences in can size of monumental proportions would not help her.

But a housewife who wants to buy evaporated skimmed milk has the same right to her choice as has a housewife who wants to buy evaporated whole milk; and by compelling her either to take it in a ten pound can or do without it altogether, the statute imposes a standard that is at once wholly discriminatory and quite arbitrary. No one could argue sensibly that a ten pound can of milk has any value in the domestic use of the average family; and, indeed, the size prohibits its use.

It is too late in the day to assume that people who come into grocery stores do not know the difference between skimmed milk and whole milk, whether they get it in a can or in a bottle. Both kinds of milk have present-day wide utilization, and we are fully able to notice judicially, in respect of the constitutional validity of a statute, as the court did in *Burns Baking Co.* v. *Bryan* (264 U. S. 504, 517), situations in which it is obvious

from " common experience " there is no real danger of deception.

The proof and the findings here negative any reasonable possibility of the plaintiff's product being " confused with " or " passed off as " whole evaporated milk " in spite of proper labeling " (REED, J. in *Carolene Products Co.* v. *U. S.*, 323 U. S. 18, 31). If it be assumed plaintiff has the burden of proof on this issue it is entitled to the benefit of the whole record, including the testimony of defense witnesses negativing confusion.

The reason why the absolute oleomargarine prohibition was sustained, as STONE, J., noted in *U. S.* v. *Carolene Products Co.* (304 U. S. 144, 151), when the case was first before the court on the sufficiency of the indictment, was that it was thought that the product was injurious to health and a substitute not distinguishable from the more healthful butter. The *Carolene* case, of course, itself involved a product regarded by Congress as injurious to health.

When the *Carolene* case reached the court after a trial and conviction of petitioners (323 U. S. 18, *supra*) the court reviewed the refusal of the judge at the trial to admit evidence showing that the nutritional deficiency with which Congress had mainly concerned itself had been corrected and sustained the conviction since the statute was aimed also at preventing substitution for or confusion with milk products.

It is obvious that the confusion to which the court referred is not a slight or casual confusion between things of equal value, but lurking behind every decision sustaining close regulation to prevent confusion is the thought that a truly inferior product or one of less value may readily be palmed off for the other. It is in this context that " confusion " is used. The extensive quotations in the second *Carolene* case (*supra,* pp. 29, 30, 31) demonstrate the background of what the court meant by " passed off as " and " confused with " (*supra,* p. 31).

It was this sensible correlation which led it to think that irrationality had not there been demonstrated by the petitioners (*supra,* pp. 31, 32). In its crucial turning point, the decision in *Hebe Co.* v. *Shaw* (248 U. S. 297, 302) depended on the court's belief that the statute was designed to prevent the fraudulent substitution of an inferior product.

It may be presumed from the very enactment of a statute such as this one is, that in 1922 the Legislature felt condensed skimmed milk was injurious to health or so lacking in essential fats as to be deficient in food value; but we are able to, and should, notice judicially the enormous growth in public knowl-

edge of the high protein and low calorie value of skimmed milk and its increasing use in the last thirty-two years by an informed public aware of what it wants.

We must look at the effect of the statute in the enlightenment of our subsequent experience. (See HOLMES, J. in *Chasleton Corp.* v. *Sinclair,* 264 U. S. 543, 547.) It is difficult to see the difference, if there is any, between the size of a can of milk and the size of the tolerances permitted in the making of a wholesome loaf of bread which the court in 1923, at least, felt amounted to an unreasonable State statute. (*Burns Baking Co.* v. *Bryan,* 264 U. S. 504, *supra.*)

We may, as it was pointed out in that case, look at the effect of the regulatory statute pragmatically to see if it has rationality. The difficulty with the Nebraska statute was that the tolerances in the baked loaves were, in the opinion of the court, too small to be practical in the preparation of bread. Although it was argued by the State that no attempt had actually been made by the baker to comply with the law and the evidence was that the law might easily have been complied with (*supra,* p. 510), the court felt that the statute was not calculated to avoid imposition of fraud and the restriction was essentially unreasonable (*supra,* p. 517).

When a later statute allowing more reasonable tolerances came before the court it was upheld (*Petersen Baking Co.* v. *Bryan,* 290 U. S. 570). The earlier decision based on different tolerances in the bread was not overruled; rather it was recognized and distinguished. It was held in the *Peterson* case merely that the tolerances of the amended statute were not affected by the rule that had been earlier announced.

In the actual decision made, as distinguished from the general language of opinion, some of the cases which have been discussed are not controlling under the facts of the case before us and were concerned with quite different kinds of problems. In *Day-Brite Lighting* v. *Missouri* (342 U. S. 421), for example, the court was dealing with the right of an employee to vote without deduction from his wages; *Daniel* v. *Family Ins. Co.* (336 U. S. 220) dealt with the right of a State to forbid insurance agents from engaging in the undertaking business; *Lincoln Union* v. *Northwestern Co.* (335 U. S. 525) dealt with the denial of opportunity to obtain and retain employment because of membership in a labor union; and *Olsen* v. *Nebraska* (313 U. S. 236) dealt with a limitation on a fee charged by an employment agency. Merely to state the subject of these regulations is to state also a rational case for legislative power.

Rationality still governs the question when it is to be decided whether a statute amounts to a naked exercise of power negatived by constitutional protection. In 1943, when much of the decisional law giving breadth to the legislative and administrative control of food products had become very well settled, it was decided in *Aerated Products Co.* v. *Godfrey* (290 N. Y. 92) it was unreasonable on the record then before the court to require by statute certain manufacturing procedures to be followed in making a frozen dessert mix which the Legislature evidently deemed required in the interest of public health.

HALPERN, J. (dissenting). I think that the judgment should be reversed. In my opinion, the statute before us is plainly constitutional, when judged in the light of the principles which must control our action in passing upon the constitutionality of legislation of this type. The scope of judicial review of legislation in the field of social and economic regulation is a very limited one. " [T]he existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators " (*U. S.* v. *Carolene Products Co.,* 304 U. S. 144, 152). The courts have no right to set aside an economic regulation adopted by the Legislature unless it is demonstrated that the Legislature could not have had any rational basis for adopting the regulation. " We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which ' should be left where . . . it was left by the Constitution — to the States and to Congress.' " (*Olsen* v. *Nebraska,* 313 U. S. 236, 246.) The formulations of the standard of judicial review in the recent decisions of the United States Supreme Court all emphasize the power of the Legislature to make the final choice in the field of social and economic regulation, so long as there is any room for choice, and the duty of the courts to refrain from interference with the legislative judgment (*Railway Express* v. *New York,* 336 U. S. 106; *Daniel* v. *Family Ins. Co.,* 336 U. S. 220). " Our recent decisions make plain that we do not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare " (*Day-Brite Lighting* v. *Missouri,* 342 U. S. 421, 423). " Under this

constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare '' (*Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525, 536–537).

As the Supreme Court pointed out in the case of *Borden's Co.* v. *Baldwin* (293 U. S. 194), from which the majority opinion quotes, the statute comes before us armored with a presumption of constitutionality. '' [I]f any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts '' (*supra,* p. 209). The burden is upon the one challenging the validity of the statute to demonstrate that no state of facts could reasonably be found to exist under which the statute would be valid exercise of legislative power.

After giving verbal recognition to this principle, the trial court (and the majority of this court) nevertheless inconsistently proceeded to examine the evidence offered by the defendant to determine whether the defendant had demonstrated the existence of a state of facts supporting the validity of the statute. The burden is the other way. There was no need for the defendant to introduce any evidence whatever. The burden was upon the plaintiff to demonstrate that no reasonable-minded Legislature could possibly have believed that there was a danger of deception or confusion if evaporated skimmed milk were allowed to be sold at retail in the same size cans as those in which evaporated whole milk was customarily sold.

When the heavy burden resting upon the plaintiff is put in this way, it becomes readily apparent that the plaintiff has failed to sustain its burden. Apart from direct authority upon this point in the decisions of the United States Supreme Court, to which reference will be made in a moment, it is self-evident that it is not unreasonable or irrational for legislators to believe that the retail sale of products as similar as evaporated milk and evaporated skimmed milk in the same size cans would lend itself to deception and confusion.

It is a matter of common knowledge that there is a substantial similarity between evaporated skimmed milk and evaporated whole milk in appearance, color, odor and taste. The process of evaporation and canning is substantially the same in the manufacture of the two products. The uses of the products are in many respects similar; in fact, the label upon the plaintiff's product specifically urges its use for the purposes for which

evaporated whole milk is commonly used. The label contains such phrases as "Whips like a dream", "Ideal for baking", "Delicious in coffee". At any rate, whatever our judgment may be as to the degree of similarity, we certainly cannot say as a matter of law that no reasonable-minded Legislature could have believed that there was a risk of deception or confusion.

The Legislature had the right to conclude that the term "evaporated milk" or "condensed milk" had come to mean in the mind of the consuming public whole milk, with a part of the water removed but otherwise containing all the constituent elements of whole milk. "Condensed milk to be what its name imports must be made from whole milk." (*Hebe Co.* v. *Shaw,* 248 U. S. 297, 306, per Day, J., dissenting.) The Legislature therefore had the right to reserve this particular method of preparing milk for retail sale exclusively for whole milk and to forbid its use for skimmed milk. That is substantially what has been done in many States by statutes which have been held to be constitutional by the United States Supreme Court (*Hebe Co.* v. *Shaw, supra*). In the *Hebe* case, the Court upheld an Ohio statute which prohibited the manufacture of condensed milk from anything other than whole milk. Mr. Justice Holmes, speaking for the Court, said, "It seems entirely clear that condensed skimmed milk is forbidden out and out" (*supra,* p. 303) and then he proceeded to hold the statute constitutional.

New York State and over half of the other States and, with respect to interstate commerce, the Federal Congress, have completely forbidden the sale of so-called filled milk, which is made of evaporated skimmed milk with vegetable fats and fish liver oils added to replace the natural fat and vitamins which had been removed in the skimming process (see Agriculture and Markets Law, § 64, subd. 3, added by L. 1922, ch. 365; Filled Milk Act, U. S. Code, tit. 21, §§ 61–64). The constitutionality of these statutes is now firmly settled (*U. S.* v. *Carolene Products Co.,* 304 U. S. 144; *Carolene Products Co.* v. *U. S.,* 323 U. S. 18).

In New York State, with respect to evaporated skimmed milk, the Legislature has not exercised its power to the maximum permissible extent of prohibiting the sale entirely. It has prohibited the sale in retail size containers but it has allowed sales to be made in containers of ten pounds or more, presumably for the use of restaurants, bakeries and other commercial purchasers (Agriculture and Markets Law, § 64, subd. 2). The purpose of the distinction is plain upon the face of the statute. The Legislature apparently concluded that, in the case of large scale users, who were familiar with the differences in the

nature of the products, the danger of deception or confusion was slight but, that the risk of deception or confusion in the case of the ordinary retail consumer was so great that the sale of skimmed milk in evaporated form in retail size cans ought to be forbidden. The fixing of the line of demarcation at the. ten pound weight needs no special justification. It is obviously a reasonable and appropriate method of attaining the legislative objective. The Kansas statute which came before the United States Supreme Court in *Sage Stores Co.* v. *Kansas* (323 U. S. 32) was almost identical with the New York statute in this respect. It prohibited the sale of any '' condensed or evaporated or powdered skim milk in containers holding less than ten (10) pounds avoirdupois net weight '' (General Statutes of Kansas [1935], 65–707, subdivision F [3]). The Court did not expressly pass on this part of the statute, since it dealt only with the filled milk prohibition in subdivision F (2), but the quoted portion of the statute was unquestionably valid under the *Hebe* case (*supra*), and the Court cited that case with approval in its opinion in the companion case, *Carolene Products Co.* v. *U. S.* (323 U. S. 18, 31, *supra*).

In *Carolene Products Co.* v. *Harter* (329 Pa. 49) the Pennsylvania Supreme Court upheld a similar statute fixing the minimum size of the container at five pounds.

It is established by the record here that evaporated milk is customarily sold in 14½ ounce cans. It is also sometimes sold in a so-called '' baby '' can containing 6 ounces. The plaintiff sells its evaporated skimmed milk in containers identical in size with the size customarily used for evaporated milk, that is, 14½ ounces. This is the very practice which the Legislature intended to prevent. As this court unanimously said upon the prior appeal in this case from the order denying the plaintiff's motion for summary judgment: '' A fair inference from the answering affidavits is that the Legislature intended to prevent customers from mistakenly purchasing evaporated skimmed milk for evaporated whole milk because of the similarity in the size of the package '' (282 App. Div. 977, 978).

A municipal ordinance regulating the size of bread loaves to protect buyers from deception was upheld in *Schmidinger* v. *Chicago* (226 U. S. 578). In the case of *Burns Baking Co.* v. *Bryan* (264 U. S. 504), cited by the court below, the statute was held invalid only because the tolerances allowed were so small that '' it was impossible to make good bread in the regular way without exceeding the tolerances then prescribed.'' (*Petersen Baking Co.* v. *Bryan*, 290 U. S. 570, 573.) But a later statute

prescribing adequate tolerances was upheld in the *Petersen* case (*supra*). The general language quoted from the *Burns* case in the opinion of the court below, throwing doubt upon the power of the Legislature to prescribe the size of bread loaves to prevent deception, was in effect overruled by the later case. (See, also, *Armour & Co.* v. *North Dakota,* 240 U. S. 510, and *Pacific States Co.* v. *White,* 296 U. S. 176.)

*Hebe Co.* v. *Shaw* (248 U. S. 297, *supra*) is directly in point in upholding the statute now before us. As has been noted, the Ohio statute considered in the *Hebe* case prohibited the manufacture or sale of condensed milk, if made of anything but whole milk. The appellants argued that the Legislature had not intended to prohibit the sale of condensed skimmed milk if labeled and sold as such. But the majority of the Court held that the statute should be construed as completely forbidding the sale of skimmed milk in condensed form and as limiting the use of the condensing process to whole milk. The Court noted that one of the purposes was " to save the public from the fraudulent substitution of an inferior product that would be hard to detect " (*supra,* p. 302) and it held: " We are satisfied that the statute as construed by us is not invalidated by the Fourteenth Amendment. The purposes * * * may be carried out in this way even though condensed skimmed milk * * * should be admitted to be wholesome " (*supra,* p. 303).

The filled milk cases are also apposite. In the *Carolene* case, the basis of the Court's decision was not that filled milk was injurious or that it was less nutritious than natural milk but that there was a risk of its confusion with evaporated whole milk and that this justified the legislative prohibition. The reasoning of the Court is directly applicable to this case. I am here speaking, not of the first *Carolene* case (304 U. S. 144, *supra*), cited in the majority opinion, but of the second case (*Carolene Products Co.* v. *U. S.,* 323 U. S. 18, *supra*). The second *Carolene* case reached the Supreme Court after a full trial on the merits. The appellant offered to prove upon the trial that after coconut oil and fish liver oil were added to the skimmed milk, the filled milk was just as nutritious and wholesome as natural milk. The trial court rejected this proof as irrelevant. The Supreme Court agreed with this ruling. It held that, even assuming for the purpose of its decision, that the " filled milk compounds as enriched are equally wholesome and nutritious as milk " (*supra,* p. 23), it was nevertheless within the power of Congress to forbid the sale of filled milk in interstate commerce " because of the danger of its confusion with the con-

densed or evaporated natural product '' (*supra,* pp. 23, 29). (See, also, *Sage Stores Co.* v. *Kansas,* 323 U. S. 32, *supra.*)

The only answer offered by the plaintiff to the danger of confusion or deception is that labeling is sufficient to warn the prospective purchaser. It may well be questioned whether labeling is efficacious under all circumstances — lighting conditions vary from store to store; the method of display often makes the label difficult to read; the purchaser may be a child or a person who for some other reason is incapable of reading and understanding the label. The customer often relies upon an oral statement by the clerk, without examining the label. '' It is true that so far as the question of fraud is concerned the label on the plaintiffs' cans tells the truth — but the consumer in many cases never sees it '' (*Hebe Co.* v. *Shaw,* 248 U. S. 297, 303, *supra*).

Furthermore, in considering the efficacy of labeling, it should be borne in mind that canned milk products are not sold under simple descriptive names. They are sold under trade or fictitious names and the public is encouraged to ask for, and to buy, the product under the trade name, without any reference to the generic description of the product. Modern day advertising attempts, by constant repetition, to din into the ears and to hammer into the mind of the consumer, the trade name by which the product is to be asked for. In this type of merchandising, the descriptive wording on the label is easily lost sight of. It is significant that the Pennsylvania statute not only forbids the sale of evaporated skimmed milk in retail size containers but, even as to the commercial size containers, it forbids the use of any trade or fictitious name and allows the product to be sold only under the simply descriptive term '' evaporated skimmed milk '', to be conspicuously displayed on the label (*Carolene Products Co.* v. *Harter,* 329 Pa. 49, *supra*). The Pennsylvania Legislature apparently did not consider a conspicuous descriptive label, even upon the commercial size container, to be sufficient, if the description was coupled with a trade name. The validity of the statute was upheld by the Pennsylvania Supreme Court. It should be noted that the plaintiff's product is customarily sold, in the States which allow its sale, under various trade names. Some of them are fairly descriptive, but others are completely unrelated to the nature of the product.

But we need not pursue this point any further; whether reliance should be placed upon labeling is wholly for the Legislature to decide. There is no constitutional principle which

requires the Legislature to accept labeling as a complete answer to the risk of confusion. " The power was in Congress to decide its own course. We need look no further. * * * In dealing with the evils of filled milk, Congress reached the conclusion that labeling was not an adequate remedy for deception." (*Carolene Products Co.* v. *U. S.*, 323 U. S. 18, 29, *supra.*) The New York Legislature had the power to reach a similar conclusion, with respect to the risk of deception or confusion in the retail sale of evaporated skimmed milk (*Hebe Co.* v. *Shaw,* 248 U. S. 297, *supra*).

It should be borne in mind that the New York statute does not provide for any labeling upon retail size containers; it simply forbids the sale of evaporated or condensed skimmed milk in such containers. The Legislature has prescribed labeling only for the large size commercial containers. It must be recognized that, if the prohibition against the sale of evaporated skimmed milk in retail size containers is invalidated, there will be left in the statute no labeling provision applicable to such containers and the door will be open to the sale by the plaintiff of its product under one of its trade names, free from any labeling requirement, so far as this statute is concerned. It is suggested that this can be met by carrying over to the retail size containers the labeling requirement which the Legislature has prescribed for ten pound cans. But this involves a rewriting of the statute and the introduction of a protective device which the Legislature had rejected as inadequate. It is beyond the power of the courts to rewrite the statute in this way.

We need hardly add that it does not follow from the fact that the Legislature has prescribed conspicuous labeling as an added precaution in connection with the sale of evaporated skimmed milk in large size containers to experienced commercial buyers, that the Legislature is bound to accept labeling as an adequate remedy against the risks of confusion or deception in the case of retail sales to the ordinary consumer. On the contrary, the Legislature had the power to decide that labeling was not an adequate remedy in retail transactions and that is in effect what it has done in the statute before us.

The statute was adopted by the New York Legislature after the holding of full legislative hearings (L. 1922, ch. 365). Unfortunately, the record of the hearings has not been preserved but we have the sworn statement of the director of the Division of Milk Control that he attended the hearings and that the " question of deceit was the subject of testimony and discus-

sion ". Congressional hearings were going on at about the same time with respect to the proposed Filled Milk Act (U. S. Code, tit. 21, § 61–64). Hearings before the Committee on Agriculture of the House of Representatives were held on June 13, 1921 to July 20, 1921. A copy of the transcript of the hearings is part of the record in the second *Carolene* case in the United States Supreme Court.

Upon the trial of this case, the Legislature's judgment in enacting the legislation was buttressed by proof offered by the defendant that, in fact, cans of evaporated skimmed milk had recently been sold to inspectors employed by the defendant, in response to a request for evaporated milk and, at least in one instance, a can of evaporated skimmed milk had been sold upon the express representation by the clerk that it was evaporated milk. But, as we already have pointed out, there is no need to rely upon this evidence to sustain the constitutionality of the law. It is enough for the court to conclude that, as a matter of common knowledge or common sense, it was not irrational or unreasonable for the Legislature to decide that a danger of deception or confusion existed and that, in its judgment, labeling did not wholly remove the risk. Once we have reached that conclusion, our function is at an end.

It is, of course, conceded that skimmed milk is not injurious to health and is wholesome, in the sense that it contains no affirmatively harmful ingredients. In fact, in the case of persons on low fat diets, it may be beneficial to drink skimmed milk instead of whole milk. But that is beside the point. The Legislature prohibited the retail sale of evaporated skimmed milk not because of any belief that skimmed milk was intrinsically injurious but because of the risk of deception, confusion or consumer misunderstanding in connection with the sale of skimmed milk in evaporated form. In this sense, the sale of evaporated skimmed milk may have injurious results. If one purchases evaporated skimmed milk under the erroneous impression that he is obtaining evaporated whole milk, he obviously suffers injury. He suffers a financial loss because of the difference in the market value of the two products and he suffers an injury to his health if he consumes the evaporated skimmed milk in the mistaken belief that he is receiving all the nutritious elements of whole milk.

It can hardly be questioned that evaporated skimmed milk is inferior to evaporated whole milk for ordinary use by persons who are not on special diets and who need all the nutrition which whole milk affords. It was in this sense that the court

referred to evaporated or condensed skimmed milk as an inferior product, in the *Hebe* case (248 U. S. 297, *supra*) and in the other cases upholding statutes forbidding the manufacture or sale of that product.

Furthermore, even if the substitute product contained all the elements of the product which the consumer had intended to purchase, it would nevertheless be within the legislative power to forbid the sale of the substitute to prevent deception or confusion. This was squarely held in the second *Carolene* case (323 U. S. 18, *supra*). The prevention of deception or confusion is in and of itself a legitimate objective of the exercise of legislative power, even though the product which the consumer may be induced to accept through fraud, mistake or misunderstanding, is in every respect as good as the product originally sought.

The prohibition of the sale of evaporated skimmed milk is not invalidated by the fact that the Legislature did not concurrently prohibit the sale of skimmed milk in its natural liquid state. It was apparently the Legislature's judgment that the risk of deception or confusion in connection with the sale of liquid skimmed milk was not great enough to warrant a prohibition. A similar judgment has been reached in other States (*Hebe Co.* v. *Shaw,* 248 U. S. 297, 302–303, 305–306, *supra*). But it does not follow from this that the Legislature's judgment the other way, with respect to evaporated skimmed milk, was unreasonable or irrational. As has already been pointed out, the Legislature had the right to find that the term " evaporated milk " had come to mean to the consuming public whole milk with only the water removed, and the Legislature had the right to conclude that the extension of the evaporating and canning process to a milk product made of anything other than whole milk would tend to deception or confusion. This conclusion, of course, had no bearing upon skimmed milk sold in bottles in its natural liquid state. Furthermore, skimmed milk in liquid form is plainly sold as such under that name, whereas evaporated skimmed milk is a canned, manufactured product, which is customarily sold under a trade name. But even if the risk of deception or confusion in the sale of liquid skimmed milk were as great as that in the sale of evaporated skimmed milk, that would not be a ground for invalidating the statute now before us. The Legislature is not required to attack all evils at once and it is no ground for invalidating a statute dealing with one segment of an evil that the Legislature has neglected to deal with other aspects equally serious. The Fourteenth Amendment

" does not compel their [the states'] legislatures to prohibit all like evils, or none. A Legislature may hit at an abuse which it has found, even though it has failed to strike at another " (*U. S.* v. *Carolene Products Co.*, 304 U. S. 144, 151, *supra*).

One other point with respect to the plaintiff's product, which adds greatly to the risk of deception, should be mentioned here. While the complaint in this case alleged that the plaintiff's product consisted only of skimmed milk, evaporated or condensed by the removal of part of the water, it appeared upon the trial that, in the manufacture of the product, fish liver oils and other substances were added in order to replace some of the vitamins which were removed with the milk fat in the skimming process. The plaintiff had apparently found that there was not an adequate market for simple evaporated skimmed milk and had decided to add the other substances to make it a more attractive and a more salable product. This greatly increased the risk of deception or confusion, particularly when the additional elements were made the basis of a claim, in advertising and labeling, that the resulting product was something different from ordinary skimmed milk and was closer to whole milk. As Mr. Justice HOLMES said in *Hebe Co.* v. *Shaw* (248 U. S. 297, *supra*), " We may assume that the product is improved by the addition, but the body of it still is condensed skimmed milk, and this improvement consists merely in making the cheaper and forbidden substance more like the dearer and better one and thus at the same time more available for a fraudulent substitute " (p. 303).

The plaintiff's product is in reality " partially filled milk ". This brings up another aspect of the case — the close relationship between the prohibition of the retail sale of evaporated skimmed milk and the prohibition of the manufacture and sale of filled milk. Evaporated skimmed milk is the basic ingredient of filled milk, which is manufactured by adding coconut oil and fish liver oil to the skimmed milk. Plaintiff's product contains some, but not all, the additives used to make filled milk out of evaporated skimmed milk. The line of demarcation may be a difficult one to draw. Having constitutionally banned the manufacture and sale of filled milk, the Legislature had the right to forbid the retail sale of the product which constituted the principal ingredient of the banned product and which, with additives, could readily be made into the banned product. Otherwise, manufacturers might start with the production of evaporated skimmed milk and then add more and more oils to it and gradually edge over into the filled milk field. Thus,

in addition to the principal purpose discussed above, the prohibition of the retail sale of evaporated skimmed milk serves the function of helping to effectuate the ban upon filled milk.

It is significant that the provision prohibiting the retail sale of evaporated skimmed milk and the provision prohibiting the manufacture or sale of filled milk are contained in the same act of the Legislature (L. 1922, ch. 365). The two provisions are parts of a single, integrated legislative scheme. This is true not only in New York State but also in other States which have adopted similar statutes (see, e.g., the Pennsylvania and Kansas statutes discussed above). We ought not to create a loophole in the statutory scheme by invalidating the portion of the statute forbidding the retail sale of evaporated skimmed milk and thus allow manufacturers to introduce into this State a product made of evaporated skimmed milk and additional elements, falling somewhat short of, but tending to come closer and closer to, the banned filled milk.

The conclusion that the New York statute does not violate the due process clause of the Fourteenth Amendment seems to me to be mandated by the decisions of the United States Supreme Court which have been discussed above. These decisions are controlling as to the construction of the Fourteenth Amendment and they should also control our decision with respect to the due process clause of the New York State Constitution. " [T]here is, logically, no room for distinction in the definition of the scope of the two clauses " (*Central Sav. Bank* v. *City of New York,* 280 N. Y. 9).

That the passage of the years has not altered the Supreme Court's view as to the constitutionality of legislation forbidding the sale of evaporated skimmed milk is demonstrated by the fact that in 1944, the court cited with approval the decision which it had made in 1919, upon this subject. The court said in 1944: " In *Hebe Co.* v. *Shaw,* 248 U. S. 297, this Court in 1919 upheld the validity of an Ohio statute which prohibited the sale of condensed milk made otherwise than from whole milk against an attack under the Fourteenth Amendment. It was assumed that the compound was wholesome and it was properly labeled. The act was sustained, however, as a proper exercise of legislative power to protect the public against fraudulent substitution " (*Carolene Products Co.* v. *U. S.,* 323 U. S. 18, 31).

It hardly needs reiteration that we are not here concerned with the wisdom or desirability of continuing this statute in

effect. We are told that great advances have been made since 1922 in the knowledge of the usefulness of skimmed milk and that the drinking of skimmed milk has become much more widespread. But the statute does not prohibit the sale of skimmed milk in fluid form; neither does it prohibit the sale of skimmed milk in powdered form. Consumers desiring skimmed milk may readily obtain it in these forms, so the increase in the demand for skimmed milk does not have any bearing upon the prohibition of the retail sale of skimmed milk in evaporated form. Neither does the greater knowledge of the value of skimmed milk in special diets have any bearing. As has been demonstrated, the statute was not based on any notion that skimmed milk was inherently harmful. It was aimed at the risk of deception and confusion and, whatever advances may have been made in the past thirty years in the knowledge of dietetics, there has been no progress in the elimination of the risk of deception or substitution in the sale of retail products. On the contrary, there has been retrogression in this area of human activity. High pressure selling and efforts to induce customers to accept substitutes have been intensified in an era in which the arts and artifices of salesmanship have been brought to a new peak of efficiency.

In any event, all these matters are for the consideration of the Legislature, not of the courts. Even if we assume that greater weight should now be given to the convenience of purchasing skimmed milk in this particular form and less weight should be given to the risk of deception and confusion, than was given in 1922, it is solely for the Legislature to say whether these changes should lead to a repeal of the statute. The weighing of conflicting considerations is exclusively within the province of the Legislature. The Legislature has the opportunity at every session to reconsider its judgment in the light of changing conditions. As recently as 1952, those interested in the sale of evaporated skimmed milk appealed to the Legislature to amend subdivision 2 of section 64 of the Agriculture and Markets Law. The bill was passed in the Assembly but was defeated in the Senate (Senate Pr. 1552, Int. 1474; Assembly Pr. 1084, Int. 1070). In October of the same year, after the defeat of the bill, the plaintiff instituted this action, seeking to obtain from the courts that which it had been unable to obtain from the Legislature. For us to undertake the process of re-evaluating the factors which influenced the legislative judgment is to usurp a function which, in a democracy, rightly belongs to the Legislature (cf. *Matter of Berson* [*Corsi*], 283 App. Div. 190, 195).

The judgment appealed from should be reversed and the complaint dismissed, with costs.

ZELLER, J., concurs with IMRIE, J.; BERGAN, J. P., concurs in a separate opinion in which IMRIE and ZELLER, JJ., concur; HALPERN, J., dissents in an opinion, in which COON, J., concurs.

Judgment affirmed, with costs to respondent.