217 F.2d 625
 VALDOSTA MILLING COMPANY, Appellant & Gross-Appellee,
v.
George GARRETSON and C. C. Garretson, Appellees & Corss-Appellants,
George GARRETSON and C. C. Garretson, Appellees & Cross-Appellants,
v.
VALDOSTA MILLING COMPANY, Appellant & Cross-Appellee.
 No. 14997.
 United States Court of Appeals Fifth Circuit.
 Dec. 15, 1954.
As Modified on Denial of Rehearing Jan. 28, 1955.
 
 Francis P. Conroy, Jacksonville, Fla., Marks, Gray, Yates & Conroy, Jacksonville, Fla., for appellant and cross-appellee.
 Willard Ayres, Ocala, Fla., Greene, Ayres & Greene, Ocala, Fla., for cross-appellants and appellees.
 Before BORAH, RIVES, and TUTTLE, Circuit Judges.
 BORAH, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the District Court in favor of plaintiffs, George Garretson and C. C. Garretson, in an action to recover the value of five horses alleged to have died as a result of eating a poisonous substance contained in feed manufactured by defendant, Valdosta Milling Company. The action was commenced in the Circuit Court of Marion County, Florida, and removed on petition of defendant to the Southern District of Florida. Trial was had by jury and a verdict of $11,330.00 returned in favor of plaintiffs. From this judgment the defendant has appealed and the plaintiffs have cross-appealed.
 
 
 2
 The complaint alleged in substance that the defendant was engaged in the manufacture and distribution of commercial feeds for animals and in particular a brand known as 'Arno-Better Horse and Mule Feed' which was registered with the Commissioner of Agriculture of Florida pursuant to F.S.A. § 580.02; that section 580.22 of that statute made it a misdemeanor for any manufacturer to sell any feeds mixed or adulterated with any substance or substances injurious to the health of livestock or poultry; that on December 11, 1948, the plaintiffs purchased a sack of 'Arno-Better Horse and Mule Feed' from Roe's Grocery and Feed Store near Fellowship, Florida, and fed the contents of the sack to five Palomino horses owned by them; that this sack of feed contained a poisonous substance, Paris green, which poisoned and killed plaintiffs' five horses, and for which damages are claimed in the sum of $11,330.00 together with interest from the date of their deaths. The basis of the cause of action was the alleged negligence of defendant in allowing the feed to become contaminated with Paris green and the breach of an implied warranty of the fitness of the product for consumption by animals.
 
 
 3
 The cause came on for trial and at the close of plaintiffs' case in chief defendant moved for a directed verdict on the grounds that the evidence was insufficient to warrant submitting the case to the jury. Following the filing of this motion there was colloquy between the court and counsel outside of the presence of the jury and in the course of this colloquy the court indicated its views but did not affirmatively rule on the motion. At the close of all the testimony defendant renewed its motion and stated as new grounds therefor that there was no showing of any negligence and no competent or sufficient evidence to warrant the jury returning a verdict in favor of plaintiffs on the theory of implied warranty. The court held that there was insufficient proof of negligence to justify submission of this issue to the jury but instructed the jury that it could find for the plaintiffs under the implied warranty theory if it found 'in effect that the feed contained poison when the defendant sold it-- that is, when it left his plant.' The jury so found.
 
 
 4
 The important questions here are: (1) whether under Florida law the doctrine of implied warranty should be applied in this case; (2) whether there was sufficient evidence to authorize a finding by the jury on the issue of implied warranty; and (3) whether the court erred in refusing to instruct the jury that interest on the value of the horses from the date of the death of the horses was allowable as an item of plaintiffs' damages and in instructing the jury that the form of verdict submitted precluded the recovery of interest.
 
 
 5
 Defendant is here insisting that the doctrine of implied warranty does not extend to provender sold for consumption by domestic animals and that there was no privity of contract between plaintiffs and defendant.
 
 
 6
 It is the general rule at common law that the doctrine of caveat emptor applies to all sales unless the seller expressly warrants against defects or a warranty is implied by operation of law. It is generally recognized that there is an implied warranty of fitness where food is sold for human consumption and most courts hold that this is so even in the absence of privity. Some courts extend this doctrine to feed sold for consumption by animals while others refuse to do so for the reason that the principle behind the rule is the protection of human life and therefore does not apply to mere property.
 
 
 7
 Although there has been no definitive statement by the courts of Florida extending the doctrine of implied warranty to foods for animals, the legislature has, we believe, statutorily so extended it. Section 580.22 of the Florida Statutes Annotated makes it a misdemeanor for any manufacturer to place in commerce any feed containing a substance injurious to the health of livestock or poultry.[1] A similar statute, the Florida Commercial Seed Law,[2] imposes strict liability upon a manufacturer for damages occasioned by placing seed on the market in violation of the provisions of that Act. Hoskins v. Jackson Grain Co., Fla., 63 So.2d 514, 515. In the Hoskins case the court said: 'Where one violates a penal statute imposing upon him a duty designed to protect another he is negligent as a matter of law, therefore responsible for such damage as is proximately caused by his negligence.' To like effect is Pine Grove Poultry Farm v. Newtown By-Products Mfg. Co., 248 N.Y. 293, 294, 162 N.E. 84, 85. There the action was for damages resulting from the death of a number of plaintiff's ducks which had eaten poultry feed manufactured by defendant which contained bits of steel wire. In that case the New York Court of Appeals said: 'The Farms and Markets Law (Consol. Laws, c. 69) controls this case. Section 130 prohibits the sale of any concentrated commercial feeding stuffs containing any substances injurious to the health of animals * * *. The feed falls within the type of good defined by sections 128 and 130. It was proved to be injurious to the health of animals, and therefore its sale was prohibited. Violation of the duty to refrain from the sale of this feed as imposed by section 130 constitutes negligence as matter of law and anyone having a special interest in the performance of that duty may sue for a breach. * * * No element of ordinary negligence is essential. Violation of the statute becomes actionable default.' Thus under the Florida statute as under the New York statute a manufacturer is negligent as a matter of law and liable for damages occasioned by placing feed on the market in violation of the act.
 
 
 8
 We come now to consider the claimed error on the part of the trial judge in refusing to direct a verdict for defendant. The rule is well settled that on a motion for a directed verdict the court must accept as true all the facts which the evidence tends to prove, and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion, and if the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury. Swift & Co. v. Morgan & Sturdivant, 5 Cir., 214 F.2d 115.
 
 
 9
 The evidence viewed in the light most favorable to the plaintiff tended to show the following: That on the evening of December 11, 1948, one of the plaintiffs, George Garretson, purchased a sack of 'Arno-Better Horse and Mule Feed' at Roe's grocery near Fellowship, Florida, placed the sack on his tractor, and took it to his farm. Upon arriving there he emptied the contents of the sack into a metal drum which was used for the storing of feed for his horses. He then took three old army helmets, filled them with feed from the drum and fed approximately five pounds of feed to each of the five horses in the barn. After feeding the horses he filled a helmet about half full of feed and fed it to two colts in the pasture behind the barn.
 
 
 10
 The following morning, he went into the barn to feed the horses and found one of them dead, three others sick and groaning. The horses appeared to be in great pain, their bowels were running off and plaintiff immediately sent for a veterinarian who came and did what he could for them. All five of the horses were dead within two days. One of the two colts in the pasture became sick but recovered within a day two.
 
 
 11
 After the death of the horses plaintiff examined the feed sack which was an ordinary type of 'croaker' sack or burlap sack and noticed that it had a green coloring inside and a patched place on it where a tear had been mended. Shortly thereafter a deputy sheriff came to the farm and took a sample of the feed by scooping some off the top. A few days later the State Feed Inspector came and took samples of both the feed and the drinking water from the horses' troughs. He obtained his samples by taking a core from the top of the feed to the bottom by means of a feed rod specially designed for that purpose. The samples thus obtained were sent to the State Chemist in Tallahassee, Florida. The chemist found upon analysis that the sample obtained by the Feed Inspector contained over 100 parts per million of arsenic trioxide and that the sample taken by the deputy contained some 600 parts per million thereof which meant that arsenic was probably present in the form of Paris green. The chemist further testified that he had examined the burlap bag in which the feed was allegedly purchased and found Paris green on parts of both sides of the sack and also the interior with the heavy concentration about two-thirds toward the bottom of the sack. It was also his testimony that the feed was composed of several rough components held together by the addition of molasses which ingredient caused it to have a characteristic lumpiness. Paris green was also found to be adhering to the outside of the lumps but the interior of the lumps was free from contamination, indicating that the poison came in contact with the feed after the molasses had been added to the dry components.
 
 
 12
 The sack in question was one of a shipment of ten sacks of that particular brand purchased from defendant by Mr. Roe, a storekeeper, from whom plaintiff obtained it. Mr. Poe received the invoice voice for the shipment on November 27, 1948, and the shipment arrived at the depot in Ocala, Florida on the morning of December 11, 1948 where he inspected the sacks for holes and found none; thereafter, he transported this feed and other types of feed in the shipment to his store twelve miles distant, making two trips. Except for the short period that part of the shipment remained on the depot platform, the feed in question was under his supervision from its arrival until purchased by plaintiff that evening. He further testified that his feed house was clean and contained no poisonous substance of any kind.
 
 
 13
 Dr. Thomas, a practicing veterinarian for twenty-one years, attended plaintiffs' horses during their sickness. He testified that in his opinion the horses were poisoned; however he did not make a pathological study nor did he cause one to be made. His opinion was corroborated by the testimony of a neighboring farmer of long experience with horses and livestock.
 
 
 14
 The defendant offered testimony as to the manner of operation of the mill. It was testified by his employees that used sacks were not utilized in packing this particular brand of feed unless specifically ordered by customers; that no poison was kept in the mill; and that it would be impossible for a foreign substance to enter the feed during the mixing process and not be evenly distributed throughout an entire batch of feed. However, in rebuttal, it was shown by plaintiffs that in the year in question defendant purchased used bags and that 'as exceptionally clean ones might come in, it might be used, replacing the same feed it had originally, and in that manner an unclean bag might have gotten out'.
 
 
 15
 Defendant contends that plaintiffs have failed to negative the possibility that the Paris green could have been introduced into the feed at some time after it left its plant. Defendant points to the fact that the feed was packed in a porous burlap sack through which foreign substances might have entered during transit on the railroad or on the depot platform. Although it is true that there is a gap in plaintiffs' proof of continuity of control, we believe that there was other evidence to support a reasonable inference that the poison was in the sack when it left defendant's plant.
 
 
 16
 The Tennessee Supreme Court dealing with a similar problem,[3] has said:
 
 
 17
 '* * * At least four such essential different situations of fact are presented in the cases dealing with liability of the manufacturer to the consumer injured by foreign substances in food and drink packages. One, where the package or bottle passes directly from the agent of the bottler or manufacturer to the consumer; and, two, where the package or bottle comes from the manufacturer so sealed, as food or drink in cans, or otherwise so constructed that its contents reach the consumer without possibility of alteration by intermediate parties, for example, glass in canned pork and beans, Campbell Soup Co. v. Davis, 163 Va. 89, 175 S.E. 743. In both of these cases the facts clearly justify the application of the resipsa loquitur doctrine, that 'the thing speaks for itself,' applied in many of the decisions, either nominally, or in effect. (Some jurisdictions limit application of this doctrine to cases of sealed cans or packages. 22 Am.Jur. 902, citing cases.) Third, where the foreign substance is so planted or imbedded in the article purchased by the consumer, that its physical location therein conclusively demonstrates its presence there when the article came from the manufacturer, as when found compressed within a plug of tobacco, or in a cake (of both of which the reported cases afford illustration). Here, again, the thing speaks for itself, not only as to the negligence, but as to the prima facie responsibility of the manufacturers therefor.
 
 
 18
 'But, there is a fourth class of cases, in which the instant case falls, which presents the difficulty with which we here have to deal; the cases of soft drink, or milk bottles, or the like, enclosed by caps which it is possible to remove and replace, by the use of care. We have here a distinctive element of fact which breaks the conclusive continuity of control between the bottler and the consumer, when the physical possession has been in a third party, such as an intermediary vendor. To close this gap of control so as to make fairly applicable the rule of presumptive or prima facie negligence on the part of the bottler or manufacturer, we are of opinion that a higher degree of proof must be made that there has been no reasonable opportunity for tampering with the bottle, or its contents, in the interim between the physical control of the bottler or manufacturer, and that of the consumer.' (Emphasis supplied.)
 
 
 19
 The defendant contends that the case at bar fits under the later category, but in our opinion it is better placed under the third situation.
 
 
 20
 The testimony of the chemist contained ample evidence of the physical location of the poison in the sack from which the jury could infer that it had been in the sack at the time the feed was poured in. He testified that the characteristic lumps caused by the admixture of molasses were coated with the poisonous substance; that in his opinion the substance had been added to the feed after the molasses was introduced. The analysis of the two samples showed a heavier concentration of poison in the sample scooped from the top of the drum than in the sample obtained by taking a core from top to bottom. When the feed was poured into the drum the contents of the bottom of the sack would be nearer the top of the drum from which it could be reasonably inferred that the poison was in the bottom of the sack when the feed was placed in it and was roughly mixed throughout the contents in greater or lesser proportions by the jostling which the sack later received.
 
 
 21
 Defendant also contends that plaintiffs failed to meet their burden of proving that the horses actually died from eating the Paris green in the feed, since they did not show what amount of Paris green would constitute a lethal dose for a horse and failed to have an examination conducted by a toxicologist, but relied entirely on the opinion of the veterinarian and a neighboring farmer. The competency of this type of testimony with respect to the diseases and condition of animals was approved by this court in Swift & Co. v. Morgan & Sturdivant, supra, where we quoted the applicable rule from 20 Am. Jur., Evidence, sec. 815, page 685:
 
 
 22
 'Diseases and Condition of Animals.-- The fact that the care of animals is generally in the hands of practical men rather than professional men renders it necessary, when considering the admissibility of opinion testimony, regarding diseases and the physical conditions or care of animals, to apply a much lower standard of qualification to witnesses giving opinion testimony on such matters than is applied to expert witnesses offering testimony as to the diseases or physical conditions of human beings. Persons who have habitually had the care of horses, cattle, dogs, and other domestic animals may testify as to their soundness or the disease which they have or to the cause of their death, as, for example, whether a horse died of fright or of some latent disease. A person need not be a veterinary to testify to such matters, although the testimony of the latter upon a subject of this character is clearly admissible. One having had previous experience as a veterinarian in general practice and experience in treating or examining cattle affected with arsenic poisoning is competent to give an opinion that cattle which he treated were affected with arsenic poisoning.' (Emphasis supplied.)
 
 
 23
 We hold that defendant's motion for a directed verdict was properly overruled.
 
 
 24
 The plaintiffs and cross-appellants claim that the trial judge erred in refusing to instruct the jury that they might allow interest from the date of the death of the horses. We do not at all agree. Plaintiffs' claim was an unliquidated claim and not subject to reasonably certain calculation by reference to existing market values because the horses in question had no clear and certain market value. This being the situation the court was right in refusing to submit to the jury the question of interest.
 
 
 25
 The other errors assigned have been carefully considered but do not merit consideration.
 
 
 26
 Finding no errors in the judgment appealed from, it is
 
 
 27
 Affirmed.
 
 
 
 [1]
 Florida Statutes Annotated, § 580.22 provides in part asfollows: 'Any manufacturer, importer, jobber, firm, Association, corporation or person who shall sell, or transport any adulterated feeds, or feeds lacking in constituent elements guaranteed in the registration of such feeds, or any feeds mixed or adulterated with any substance or substances injurious to the health of livestock or poultry shall be deemed guilty of a misdemeanor and, after conviction on said charge, in addition to the penalty provided in this section * * *.' This section further provides that anyone violating this chapter shall be guilty of a misdemeanor
 
 
 [2]
 Florida Statutes Annotated, § 578.13
 
 
 [3]
 Coca-Cola Bottling Works v. Sullivan, 178 Tenn. 405, 414, 158 S.W.2d 721, 725, 171 A.L.R. 1200