George L. WHITE, Appellant,

v.

Coy H. ROSE, also known as Coy N. Rose, individually, and doing business as Rose Feed Co., Appellee.

No. 5409.

United States Court of Appeals Tenth Circuit.

Jan. 12, 1957.

Huxman, Circuit Judge, dissented.

Wm. Hedges Robinson, Jr., Denver, Colo., for appellant.

Fred M. Winner, Denver, Colo. (Max D. Melville and William G. Berge, Denver, Colo., were with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The plaintiff, George L. White, a cattle rancher in southwestern Colorado, bought from a retail dealer in Colorado a quantity of prepared livestock feed which had been manufactured and packaged by the defendant in Kansas. The product contained approximately 7% elemental sulphur and protein, neither of which, used alone, is harmful to cattle. Plaintiff fed the product to his cattle as directed and a short time thereafter thirty-three head of them died. He brought this action to recover damages. The case was tried to the court without a jury and judgment was entered for the defendant.

The complaint alleged that the feed purchased contained poisonous, deleterious and harmful substances in violation of the laws of the State of Colorado. By answer the defendant admitted that he manufactured commercial livestock feed which was offered and exposed for sale to the general public in the State of Colorado, including the plaintiff. The answer denied that the feed contained poisonous, deleterious and harmful substances which were known to the defendant, and specifically denied that the feed contained substances in violation of the laws of the State of Colorado. The court found that the feed was made available and fed to plaintiff's cattle according to defendant's direction. The court also found that "as was established by tests conducted after the death of plaintiff's cattle, the combination of elemental sulphur and protein, when the feed is eaten in excessive quantities by cattle, results in the creation of hydrogen sulphide gas in their stomachs, and such hydrogen sulphide gas caused the death of plaintiff's cattle"; it also found that the defendant did not know, and in the exercise of reasonable care should not and could not have known that the feed manufactured by him, if used as recommended and directed, would cause death or injury to cattle. From this finding the court concluded that "there is no evidence that the defects in this feed were known to the defendant or should or could have been known to him in the exercise of reasonable care. Accordingly, there is no actionable negligence".

Although it has been stated to be a general rule that there is no liability on the part of a negligent manufacturer to a remote vendee of its product because of lack of privity, the trend of decisions has been to abandon the rule and, in proper cases, place liability on the wrongdoing manufacturer where it belongs. Restatement, Torts, 394–402; Carter v. Yardley & Co., Ltd., 319 Mass. 92, 103, 64 N.E.2d 693, 164 A.L.R. 559; Spencer v. Madsen, 10 Cir., 142 F.2d 820. The

liability in such a case arises, not out of the contract or direct privity between the wrongdoer and the injured person, but out of a duty which the law imposes. It extends to any persons who might reasonably be expected to suffer injury therefrom.

The trial court, while recognizing that privity was not necessary, construed Spencer v. Madsen, supra, as requiring knowledge of defects or imperfections on the part of a remote manufacturer as essential to liability in cases of this nature. The Madsen case was an application of the doctrine of liability of a manufacturer to a third person when, by the nature of a manufactured article, it is reasonably certain to be dangerous or injurious to users if negligently made. That case grew out of injuries resulting from a defective motor vehicle axle and followed the rule as established in the land-mark case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696.[1] It was stated that liability under this rule springs from defects which were known, or by the exercise of reasonable care by the manufacturer should have been known to be dangerous. The case at bar was not brought upon the theory of the Madsen and MacPherson rule, but upon the theory that the feed in question was sold in violation of the Colorado Statutes which set forth certain standards to be applied in the manufacture and sale of livestock feed, and that the manufacture and sale of such feed in violation of the Colorado Statutes constitutes negligence as a matter of law. We think the Colorado Statutes control and the case must be decided upon statutory liability, and not upon liability for common-law negligence.

66–14–1, Colo.Rev.Stat.1953, a section of the Colorado Pure Foods Act, makes it unlawful to manufacture, sell or expose for sale any article which is adulterated or misbranded, and it provides that the violation of the Act shall constitute a misdemeanor.[2] 66–14–5 defines the term "food" to include all articles used for food by man or animals, whether simple, mixed or compounded. 66–14–6 states that an article of food shall be deemed to be adulterated if it contains certain named poisons "or other added deleterious ingredient[s] which may render such article injurious to health."

Subsequent to the passage of the Colorado Pure Foods Act, a statute known as "Commercial Feeding Stuffs Act" was passed. Colo.Rev.Stat.1953, 8–14. This Act deals with commercial feeds for animals and birds, manufactured or sold in Colorado. The Act contemplates that a manufacturer shall submit his product to and obtain a permit to sell the same from the Commissioner of Agriculture by the furnishing of a statutory bond and the payment of the required licenses and fees. 8–14–3, 8–14–4, 8–14–5, and 8–14–6. 8–14–10 defines adulterated "commercial feeding stuffs" to include mixing "with commercial feeding stuffs any substance or substances injurious to the health of livestock or poultry". Any manufacturer who shall adulterate any commercial feeding stuffs shall be guilty of a misdemeanor. 8–14–11.

---

1. The rule in the Madsen case which the trial court relied upon was quoted from MacPherson. It reads: " * * * 'If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully.' * * * " [142 F.2d 823.] In this case Justice Cardozo relied upon the New York falsely labeled poison and explosive decisions. Thomas v. Winchester, 6 N.Y. 397, 57 Am.Dec. 455; of which Loop v. Litchfield, 42 N.Y. 351, 1 Am. Rep. 543, and Statler v. George A. Ray Mfg. Co., 195 N.Y. 478, 88 N.E. 1063, are examples.

2. This section excepts from its provisions articles "in the original package and the subject of interstate commerce under the federal jurisdiction."

These two Acts declare the public policy of Colorado in respect to the protection of the public against the manufacture and sale of food and foodstuffs, including livestock feeds, containing deleterious elements or ingredients which cannot be known or determined by the public. They impose a broad and far-reaching duty upon manufacturers of livestock feeds for the benefit of those who use the product and who are the real sufferers if the statute is violated. One who has suffered from a disregard of the statutory duty has a cause of action for damages.[3] The statutory violation becomes actionable and no element of ordinary negligence is essential. Abounader v. Strohmeyer & Arpe Co., 243 N.Y. 458, 154 N.E. 309; Pine Grove Poultry Farm v. Newtown By-Prod. Mfg. Co., 248 N.Y. 293, 162 N.E. 84; W. A. Hover & Co. v. Denver & R. G. W. R. Co., 8 Cir., 17 F.2d 881, 883. This latter case arose in Colorado, and in referring to liability for violation of a statute, the court states the rule as follows: "Where a statute imposes a duty upon a person for the protection or benefit of others, and he neglects to perform that duty, he is guilty of negligence, and is liable to those for whose protection or benefit it was imposed, for any injuries of the character which the statute is designed to prevent and which were proximately caused by such negligence." In Valdosta Milling Co. v. Garretson, 5 Cir., 217 F.2d 625, 628, the court, in referring to a Florida statute making it a misdemeanor for a manufacturer to place in commerce any feed containing a substance injurious to livestock or poultry, said: "Thus under the Florida statute as under the New York statute a manufacturer is negligent as a matter of law and liable for damages occasioned by placing feed on the market in violation of the act."

The Colorado Commercial Feeding Stuffs Act concerns itself with the manufacture, distribution or sale of commercial feeds for animals or birds. Under its terms the mixing with commercial feedstuffs of any substance injurious to the health of livestock constitutes adulteration and a violation of the criminal section of the Act. The Act could have no other purpose than to protect those who purchase commercial feeds for livestock. Plaintiff's injury was the very kind that the statute was intended to prevent. The defendant did not mix with his commercial feed a substance which alone was injurious to the health of livestock, but he did mix together two constituents and ingredients, or elements, which when combined were injurious to the health of cattle; and it was unwholesome and unfit for consumption by livestock when fed as directed, and resulted in the death of plaintiff's cattle.[4] We think, under the court's finding, such a combination constituted adulteration within the meaning of the Act. Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co., 126 Mont. 415, 252 P.2d 1040. No doubt the single elements of many known poisons are harmless, but a manufacturer would not be excused from liability if he, contrary to statutory provisions, mixed in a product elements which when combined created a poison, even though he was not aware that the poison would be created by the

3. In an Oklahoma case this court said: "The failure to perform a statutory duty imposed under the police power of the state for the protection of the public, or the violation of an express statute for the protection of the public, constitutes negligence." Earl W. Baker & Co. v. Lagaly, 10 Cir., 144 F.2d 344, 346, 154 A.L.R. 1098. See also Kurth v. Krumme, 143 Ohio St. 638, 56 N.E.2d 227; 36 C.J.S., Food, § 58.

4. A pamphlet which the defendant furnished the plaintiff at the time of sale, contained the following instructions:

"Keep Diet-Rite Life-Saver out in a feeder where your cattle will have free access to it all the time, so they can eat all they need of it—when they need it. The cattle themselves know when they need it. It will keep them healthy * * * will keep the stomach sweet and the digestive system functioning properly * * will help prevent overeating.

"Don't let your cattle go without Diet-Rite Life-Saver!"

mixture. The statute places a duty upon the manufacturer not to place upon the market an adulterated product.

█ The defendant, as a manufacturer, qualified under the provisions of the Commercial Feeding Stuffs Act, and shipped his product to Colorado for resale. No contention is made that he was not subject to the provisions of the Commercial Feeding Stuffs Act. We think the law is well established that the sale or distribution of commercial feedstuffs in Colorado which are adulterated within the meaning of the Colorado Statutes constitutes negligence as a matter of law, for which an action to recover resulting damages may be maintained in Colorado, even though the manufacturer did not know, or in the exercise of ordinary care could not have known the deleterious characteristics of the commodity sold. These are requirements of common-law negligence, and do not apply to statutory liability. C. L. McMahon, Inc., v. Smith, 189 Okl. 579, 118 P.2d 1022; Valdosta Milling Co. v. Garretson, supra; Pine Grove Poultry Farm v. Newtown By-Prod. Mfg. Co., supra; Hoskins v. Jackson Grain Co., Fla., 63 So.2d 514; Greeley Irrigation Co. v. House, 14 Colo. 549, 24 P. 329.

Judgment is reversed and the case remanded with instructions to determine plaintiff's damages and enter judgment accordingly.

HUXMAN, Circuit Judge (dissenting).

I cannot agree with my associates that the decision is determined solely by the Colorado Foodstuffs Statute. Of course, if Rose violated the Colorado Statute, then there is an end to the case and there is no need of looking to common-law liability. Since, however, it is my conclusion that there was no violation of the provisions of the Colorado Foodstuffs Statute it is necessary to consider whether there is liability under the common law.

Without discussing common-law liability or citing authorities, it is sufficient to say that the Court's finding that "there is no evidence that the defects in this feed were known by defendant or should or could have been known by him in the exercise of reasonable care" precludes common-law liability.

Since the decision rests upon a construction of the Colorado Foodstuffs Statute and involves the policy of Colorado with respect to such sales, it is unfortunate that we do not have a construction of the Statute by that Court. Apparently the question has never been before the State Court and it is, therefore, our duty to construe the statute.

As stated in the majority opinion, Colorado has two statutes dealing with adulteration of foods. Section 66–14–1 et seq., deals with the sale of adulterated foods and drugs for human consumption. It defines specific elements which constitute adulteration. It then contains a general provision providing that foodstuffs shall be considered adulterated which contain "other added deleterious ingredient which many render such article injurious to health."

Section 8–14–1 defines commercial feeds. Section 8–14–10 defines what constitutes adulteration with respect to such feeds. It sets out detailed illustrations of what constitutes adulteration, such as the addition of "hair, hoof or horn meal, stomach contents, rice hulls, chaff" and many more specific foreign substances. It, like Section 66–14–6, contains a catch-all provision making it unlawful "to mix with commercial feeding stuffs any substance or substances injurious to the health of livestock or poultry." If Rose violated the statute, he violated the last-quoted provision thereof.

The word "adulterated", the subject of these statutes, has a well-defined, generally understood and accepted meaning. In general, it means a substance is adulterated when it contains a corrupt, deleterious, harmful substance or substances. To adulterate means to add a foreign substance that is harmful, impure and unwholesome, making the adulterated product unfit and dangerous to consumption. Webster's New Interna-

tional Dictionary, 1928 Edition, states that adulterate means "To corrupt, debase, make impure by an admixture of a foreign or a baser substance; * * *." In law the term has been defined as meaning corruption by the addition of a foreign substance;[1] to corrupt, debase or make impure by an admixture of a foreign or debase substance.[2]

To add a substance or substances to a feed which is injurious to livestock is one form of adulteration. Adulteration results from the addition of a substance or substances which in themselves are base, inferior and detrimental to health of livestock. Neither sulphur nor protein are base or injurious substances. They are both wholesome elements used in food. Rose, therefore, did not add a dangerous or debase element to his feed. The combination of a 7% mixture of sulphur and protein did not of itself create a poisonous or dangerous food as is evidenced by the fact that this same mixture has been fed to cattle for two years without any harmful results. It apparently became injurious only when eaten in excessive quantities. The Court found that death resulted from eating excessive quantities of this feed.

If the result from excessive over-eating makes this foodstuff an adulterated food within the meaning of the statute then whole wheat when sold as a feed for consumption by livestock is likewise an adulterated food, because it is a well-known fact that if consumed in excessive quantities it will cause death. So also it is a fact of common knowledge that luscious growing wheat in the fall of the year will kill cattle if permitted at first to have unrestrained access thereto. Death in such case results from over-eating and not from eating an adulterated contaminated food.

As I construe the statute, what Colorado sought to prevent was the addition of harmful elements to feed from the addition of which injury or harm would result because of the debased, unwholesome nature of the added elements. Until the Courts of Colorado hold otherwise, I shall continue to be of the view that the legislature never intended to make the processor of an admixture of wholesome food elements an absolute insurer that no harmful effects could result under any condition or conceivable circumstances and that the intent was to prevent the addition of base, unwholesome elements which in themselves were harmful. I, therefore, conclude that there was no liability per se under the statute and that there was no common-law liability because under the Court's finding Rose was free of negligence which would impose the liability. I would, therefore, affirm the judgment.

---

1. United States v. 24 Cases, More or Less, etc., D.C., 87 F.Supp. 826, 827.

2. Defiance Milk Products Co. v. Du Mond, 285 App.Div. 337, 136 N.Y.S.2d 619, 625.