In the Matter of the Application of JEAN KAY, Petitioner, against BOARD OF HIGHER EDUCATION OF THE CITY OF NEW YORK, Respondent, for an Order Reviewing the Determination of the Respondent Herein, Appointing One Dr. BERTRAND RUSSELL as Professor of Philosophy in the College of the City of New York, and Directing the Respondent to Rescind and Revoke the Said Appointment of the Said Dr. BERTRAND RUSSELL.*

Supreme Court, New York County. March 30, 1940.

*Joseph Goldstein* [*William S. Bennet* of counsel], for the petitioner.

*William C. Chanler, Corporation Counsel* [ *Nicholas Bucci, Assistant Corporation Counsel,* of counsel], for the respondent.

McGEEHAN, J. In this application, under article 78 of the Civil Practice Act, the petitioner seeks to review the action of the board of higher education in appointing Bertrand Russell to the chair of philosophy at City College. Petitioner contends that the action of the board of higher education was illegal and an abuse of such powers as the board of higher education had in making such appointments, because (a) Bertrand Russell was not a citizen and had not declared his intention to become a citizen; (b) the

* Appeal dismissed, 259 App. Div. ——.

appointment did not comply with article V, section 6, of the Constitution of the State of New York with reference to appointments in civil service on the basis of merit and fitness; and, finally, (c) because the appointment was against public policy because of the teachings of Bertrand Russell and his immoral character.

The corporation counsel, appearing on behalf of the board of higher education of the city of New York, moved to dismiss the petition upon the ground that it did not state facts sufficient to constitute a cause of action. The corporation counsel's motion was based solely upon the ground that the provisions in the Education Law with respect to citizenship were not binding on the board of higher education.

Three organizations appeared through their attorneys and asked leave to file briefs as *amici curiæ* in support of the appointment of Bertrand Russell. Permission was granted on the argument for the filing of these briefs as *amici curiæ*. These three parties contend that the appointment is lawful, that citizenship was not an issue and the appointment should not be disturbed because it would be an interference with " academic freedom."

The motion of the corporation counsel to dismiss the petition upon the ground that the board of higher education is not required to employ citizens is denied. It is not necessary to pass upon this question to deny the application because the application is based on two additional grounds to which the motion of the corporation counsel was not addressed. The court has afforded the respondent an opportunity to interpose an answer, but the respondent has declined to interpose an answer though counsel has informed the court that its defense is to be limited to the question of law raised by the cross-motion to dismiss the petition.

Petitioner contends, in the first place, that section 550 of the Education Law requires that " No person shall be employed or authorized to teach in the public schools of the State who is: * * * 3. Not a citizen. The provisions of this subdivision shall not apply, however, to an alien teacher now or hereafter employed, provided such teacher shall make due application to become a citizen and thereafter within the time prescribed by law shall become a citizen." It is conceded that Bertrand Russell is not a citizen and that he has not applied to become a citizen. The corporation counsel contends that he has a reasonable time after appointment to make the application. He further contends that the section does not apply to teachers in the colleges of the city of New York, contending that if section 550 did apply, most of the teachers in the colleges of the city of New York would be holding their appointments illegally because they are neither graduates of a State normal

school nor have they licenses from the Commissioner of Education. The section does not require that they have a license from the Commissioner of Education. It requires in subdivision 2 that they must either be in possession of a teacher's certificate issued under the authority of the Education Law, or a diploma from a State normal school or the State normal college, and certainly, if they have been appointed and received a certificate of appointment from the board of higher education, they have been appointed and hold a teacher's certificate under the authority of the Education Law. It does not seem logical that the section was ever intended to cover a case similar to the case of Bertrand Russell who has been in this country for some time and who has never made any application for citizenship and who apparently, as shall hereafter appear, would be denied citizenship. The section applies generally to " teachers and pupils " and is not limited to elementary and secondary schools, and the court, therefore, holds that Bertrand Russell is not qualified to teach by reason of the provisions of this section, but the decision herein made is not based solely upon this ground.

The second contention of the petitioner is that no examination of any kind was given to Bertrand Russell at the time of his appointment, and this is borne out by the minutes of the administrative committee of the City College of the City of New York and of the board of higher education at the time of his appointment. The Court of Appeals has held in the case of *Matter of Becker* v. *Eisner* (277 N. Y. 143, 151) that " We need not at this time undertake to say how far the Legislature may go in exempting all positions under the Board of Higher Education from competitive examinations. Until it is determined by the Legislature or some other body that such examinations are impracticable, the Constitution (Art. V, § 6) is to be enforced.

" The power of the Legislature in this particular is discussed in *Matter of Ottinger* v. *Civil Service Commission* (240 N. Y. 435). which authority condemns as illegal this attempt to legislate into an exempt class all positions for which there has not been heretofore an examination."

In *Matter of Sloat* v. *Bd. of Examiners* (274 N. Y. 367, 370) the Court of Appeals stated: " Statutes and administrative orders, alike, must conform to the mandate of the Constitution. They cannot authorize a procedure which would disregard or nullify that mandate. A person aggrieved by an order or determination of an administrative board or officer which has such result may, in proper case, appeal for redress to the courts. (*Matter of Barthelmess* v. *Cukor*, 231 N. Y. 435.) Upon such appeal the courts are

not to be satisfied by lip-service. Disobedience or evasion of a constitutional mandate may not be tolerated even though such disobedience might, perhaps, at least temporarily, promote in some respects the best interests of the public. Arbitrary decision that in a given case it is not practicable to ascertain merit and fitness by competitive examination may be challenged and is subject to review by the courts. (*Matter of Keymer*, 148 N. Y. 219; *Matter of Scahill* v. *Drzewucki*, 269 N. Y. 343.) An examination is not competitive merely because it is so denominated. The substance, not merely the form, of a competitive examination is required."

In *Matter of Carow* v. *Bd. of Education* (272 N. Y. 341, 344, 347) the Court of Appeals said: " The Constitution, article V, section 6, in part provides that ' appointments and promotions in the civil service of the State, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, *so far as practicable, shall be competitive.*' The Legislature may not disregard, evade or weaken the force of that mandate. It applies to every position in the civil service of the State, but within limits which we have attempted to define in other cases, the Legislature may determine whether it is practicable to ascertain merit and fitness for a particular position by competitive examination, or, indeed, by any examination * * *

" Even casual consideration of the offices comprised in the unclassified civil service leaves little doubt that the Legislature in most cases determined that it was not practicable to ascertain merit and fitness by examination, and intended that both in appointment and removal the appointing officers should be free to pass upon the merit and fitness of those appointed by them; and in most cases the legislative determination may hardly be challenged as unreasonable. In the case, however, of teachers in the public schools in large cities, it might well be argued that a determination by the Legislature that appointments and promotions according to merit and fitness ascertained by competitive examination is impracticable, would be arbitrary."

While it is not necessary for this court to adjudicate the action of the board of higher education in proceeding by assuming that a competitive examination for the position of professor of philosophy in City College was impracticable, such assumption on the part of the board of higher education is held to be unwarranted, arbitrary and capricious and in direct violation of the plain mandate of the Constitution of the State of New York. If there were only one person in the world who knew anything about philosophy and mathematics and that person was Mr. Russell, the taxpayers

might be asked to employ him without examination, but it is hard to believe, considering the vast sums of money that have been spent on American education, that there is no one available even in America, who is a credit both to learning and to public life. Other universities and colleges, both public and private, seem to be able to find American citizens to employ and to say that the College of the City of New York could not employ a professor of philosophy by an examination of some sort, is an assumption by the board of higher education of the power which was denied to them by the People of the State of New York in the Constitution and no Legislature and no board can violate this mandate.

The foregoing reasons would be sufficient to sustain the petition and to grant the relief prayed for but there is a third ground on which the petitioner rests and which, to the court, seems most compelling. The petitioner contends that the appointment of Bertrand Russell has violated the public policy of the State and of the nation because of the notorious immoral and salacious teachings of Bertrand Russell and because the petitioner contends he is a man not of good moral character.

It has been argued that the private life and writings of Mr. Russell have nothing whatsoever to do with his appointment as a teacher of philosophy. It has also been argued that he is going to teach mathematics. His appointment, however, is to the department of philosophy in City College.

In this consideration I am completely dismissing any question of Mr. Russell's attacks upon religion, but there are certain basic principles upon which this government is founded. If a teacher, who is a person not of good moral character, is appointed by any authority the appointment violates these essential prerequisites. One of the prerequisites of a teacher is good moral character. In fact, this is a prerequisite for appointment in civil service in the city and State, or political subdivisions, or in the United States. It needs no argument here to defend this statement. It need not be found in the Education Law. It is found in the nature of the teaching profession. Teachers are supposed not only to impart instruction in the classroom but by their example to teach the students. The taxpayers of the city of New York spend millions to maintain the colleges of the city of New York. They are not spending that money nor was the money appropriated for the purpose of employing teachers who are not of good moral character. However, there is ample authority in the Education Law to support this contention.

Section 556 in the same general article, article 20, entitled " Teachers and Pupils," reads as follows: " A school commissioner

shall examine any charge affecting the moral character of any teacher within his district, first giving such teacher reasonable notice of the charge, and an opportunity to defend himself therefrom; and if he find the charge sustained, he shall annul the teacher's certificate, by whomsoever granted, and declare him unfit to teach; and if the teacher holds a certificate of the Commissioner of Education, or of a former Superintendent of Public Instruction or a diploma of a State normal school, he shall notify the Commissioner of Education forthwith of such annulment and declaration."

It has been argued that this section does not apply. Assuming it does not apply to the board of higher education specifically, it is a declaration of the public policy of this State. It is inconceivable that the board of higher education would dare to contend that they had the power to appoint persons of bad moral character as teachers in the colleges of the city of New York. If that is their contention, then this proceeding is properly and timely brought. We do not have to go far to find authority for this contention in the decisions of the courts.

In *Matter of Epstein* v. *Bd. of Education* (162 Misc. 718, 721) Mr. Justice SHIENTAG said: " The board of examiners has the right to expect of applicants for licenses to teach ' a nice and scrupulous sense of honor which is as unlike mere honesty as the fine Damascus blade is unlike a farming implement.' It has a right to expect from them a strong and delicate sense of moral values."

The contention of the petitioner that Mr. Russell has taught in his books immoral and salacious doctrines, is amply sustained by the books concededly to be the writings of Bertrand Russell, which were offered in evidence. It is not necessary to detail here the filth which is contained in the books. It is sufficient to record the following: From " Education and the Modern World," pages 119 and 120: " I am sure that university life would be better, both intellectually and morally, if most university students had temporary childless marriages. This would afford a solution of the sexual urge neither restless nor surreptitious, neither mercenary nor casual, and of such a nature that it need not take up time which ought to be given to work." From " Marriage and Morals," pages 165 and 166: " For my part, while I am quite convinced that companionate marriage would be a step in the right direction, and would do a great deal of good, I do not think that it goes far enough. I think that all sex relations which do not involve children should be regarded as a purely private affair, and that if a man and a woman choose to live together without having children, that should be no one's business but their own. I should not hold it desirable that either a man or a woman should enter upon

the serious business of a marriage intended to lead to children without having had previous sexual experience. (" The peculiar importance attached, at the present, to adultery, is quite irrational." From " What I Believe," p. 50.)

The Penal Law of the State of New York is a most important factor in the lives of our people. As citizens and residents of our city we come within its protective scope. In dealing with human behavior the provisions of the Penal Law and such conduct as therein condemned must not be lightly treated or completely ignored. Even assuming that the board of higher education possesses the maximum power which the Legislature could possibly confer upon it in the appointment of its teachers, it must act so as not to violate the Penal Law or *to encourage the violation of it.* Where it so acts as to sponsor or encourage violations of the Penal Law, and its actions adversely affect the public health, safety and morals, its acts are void and of no legal effect. A court of equity, with the powers inherent in that court, has ample jurisdiction to protect the taxpayers of the city of New York from such acts as this of the board of higher education.

In *People ex rel. Bennett* v. *Laman* (277 N. Y. 368) the Court of Appeals, in restraining a person without a license from practicing medicine, said (at p. 378): " Although invasion of property rights or pecuniary interests is emphasized in some of the earlier cases as a basis for equitable interference, there appeared later a recognition that public health, morals, safety and welfare of the community equally required protection from irreparable injury." This has been held in other jurisdictions. (See *Stead* v. *Fortner*, 255 Ill. 468, 478; 99 N. E. 680; *Matter of Badger*, 286 Mo. 139; 226 S. W. 936.) The fact that the question may appear to be novel does not even give rise to an inference that a court of equity is without jurisdiction. (*Piper* v. *Hoard*, 107 N. Y. 73, 76.)

The Penal Law of the State of New York defines the crime of abduction and provides that a person who uses or procures to be taken or used, a female under eighteen years of age, when not her husband, for the purpose of sexual intercourse, or a person who entices an unmarried female of any age of previous chaste character to any place for the purpose of sexual intercourse is guilty of abduction and punishable by imprisonment for not more than ten years (§ 70). Furthermore, the Penal Law provides that even a parent or guardian having legal charge of a female under eighteen years of age and who consents to her being taken by any person for the purpose of sexual intercourse violates the law and is punishable by imprisonment for not more than ten years (§ 70).

As to the crime of rape the Penal Law provides that a person who perpetrates an act of sexual intercourse with a female not his wife under the age of eighteen years, under circumstances not amounting to rape in the first degree, is guilty of rape in the second degree and punishable by imprisonment for not more than ten years (§ 2010).

Section 100 of the Penal Law makes adultery a criminal offense.

Section 2460 of the Penal Law, among other things, provides that any person who shall induce or attempt to induce any female to reside with him for immoral purposes shall be guilty of a felony and on conviction punishable by imprisonment for not less than two years, nor more than twenty years and by a fine not exceeding $5,000.

When we consider the vast amount of money that the taxpayers are assessed each year to enforce these provisions of the law, how repugnant to the common welfare must be any expenditure that seeks to encourage the violation of the provisions of the Penal Law. Conceding arguendo that the board of higher education has sole and exclusive power to select the faculty of City College and that its discretion cannot be reviewed or curtailed by this court or any other agency, nevertheless, such sole and exclusive power may not be used to aid, abet or encourage any course of conduct tending to a violation of the Penal Law. Assuming that Mr. Russell could teach for two years in City College without promulgating the doctrines which he seems to find necessary to spread on the printed pages at frequent intervals, his appointment violates a perfectly obvious canon of pedagogy, namely, that the personality of the teacher has more to do with forming a student's opinion than many syllogisms. A person we despise and who is lacking in ability cannot argue us into imitating him. A person whom we like and who is of outstanding ability, does not have to try. It is contended that Bertrand Russell is extraordinary. That makes him the more dangerous. The philosophy of Mr. Russell and his conduct in the past is in direct conflict and in violation of the Penal Law of the State of New York. When we consider how susceptible the human mind is to the ideas and philosophy of teaching professors, it is apparent that the board of higher education either disregarded the probable consequences of their acts or were more concerned with advocating a cause that appeared to them to present a challenge to so-called " academic freedom " without according suitable consideration of the other aspects of the problem before them. While this court would not interfere with any action of the board in so far as a pure question of " valid " academic freedom is concerned, it will not tolerate academic freedom being

used as a cloak to promote the popularization in the minds of adolescents of acts forbidden by the Penal Law. This appointment affects the public health, safety and morals of the community and it is the duty of the court to act. Academic freedom does not mean academic license. It is the freedom to do good and not to teach evil. Academic freedom cannot authorize a teacher to teach that murder or treason are good. Nor can it permit a teacher to teach directly or indirectly that sexual intercourse between students, where the female is under the age of eighteen years, is proper. This court can take judical notice of the fact that students in the colleges of the city of New York are under the age of eighteen years, although some of them may be older.

Academic freedom cannot teach that abduction is lawful nor that adultery is attractive and good for the community. There are norms and criteria of truth which have been recognized by the founding fathers. We find a recognition of them in the opening words of the Declaration of Independence, where they refer to the laws of nature and of Nature's God. The doctrines therein set forth, which have been held sacred by all Americans from that day to this, preserved by the Constitution of the United States and of the several States and defended by the blood of its citizens, recognizing the inalienable rights with which men are endowed by their Creator must be preserved, and a man whose life and teachings run counter to these doctrines, who teaches and practices immorality and who encourages and avows violations of the Penal Law of the State of New York, is not fit to teach in any of the schools of this land. The judicial branch of our government under our democratic institutions, has not been so emasculated by the opponents of our institutions to an extent to render it impotent to act to protect the rights of the people. Where public health, safety and morals are so directly involved, no board, administrative or otherwise, may act in a dictatorial capacity, shielding their actions behind a claim of complete and absolute immunity from judicial review. The board of higher education of the city of New York has deliberately and completely disregarded the essential principles upon which the selection of any teacher must rest. The contention that Mr. Russell will teach mathematics and not his philosophy does not in any way detract from the fact that his very presence as a teacher will cause the students to look up to him, seek to know more about him, and the more he is able to charm them and impress them with his personal presence, the more potent will grow his influence in all spheres of their lives, causing the students in many instances to strive to emulate him in every respect.

In considering the power of this court to review the determination and appointment of Dr. Russell by the board of higher education this court has divided the exhibits in this proceeding into two classes, namely, those exhibits which dealt with controversial measures not *malum in se* as far as the law is concerned, even though abhorrently repulsive to many people, and those considered *malum in se* by the court. Dr. Russell's views on masturbation, such as expressed in his book entitled " Education and the Good Life," at page 211, in which he goes on to state: " Left to itself, infantile masturbation has, apparently, no bad effect upon health, and no discoverable bad effect upon character; the bad effects which have been observed in both respects are, it seems, wholly attributable to attempts to stop it. Therefore, difficult as it may be, the child should be left alone in this respect;" his views on nudity as expressed in the same book, on page 212, in which he goes on to state: " A child should, from the first, be allowed to see his parents and brothers and sisters without their clothes whenever it so happens naturally. No fuss should be made either way; he should simply not know that people have feelings about nudity;" his views on religion and politics; his own personal life and conduct with the incidental convictions and libels are all matters that this court holds to be proper subjects to be considered by the board of higher education in appraising the moral character of Dr. Russell as a professor, and on these subjects the determination of the board of higher education is final. If the standards of the board of higher education in these respects are lower than common decency requires, the remedy is with the appointing power who may be held responsible for appointing individuals with moral standards below that required for the public good. But as to such conduct this court is powerless to act because of the power conferred by law on the board of higher education. But where the matter transcends the field of controversial issues and enters the field of criminal law, then this court has the power and is under a duty to act. While in encouraging adultery in the language used in the book " Education and the Good Life," at page 221, " I shall not teach that faithfulness to our partner through life is in any way desirable, or that a permanent marriage should be regarded as excluding temporary episodes," it might be urged that he is only encouraging the commission of a misdemeanor rather than a felony, yet that mitigating argument must fall when we are confronted with Dr. Russell's utterances as to the damnable felony of homosexualism, which warrants imprisonment for not more than twenty years in New York State, and concerning which degenerate practice Dr. Russell has this to say in his book entitled " Education and the Modern World," at page 119: " It is possible that homosexual

relations with other boys would not be very harmful if they were tolerated, but even then there is danger lest they should interfere with the growth of normal sexual life later on."

Considering Dr. Russell's principles with reference to the Penal Law of the State of New York, it appears that not only would the morals of the students be undermined, but his doctrines would tend to bring them, and in some cases their parents and guardians, in conflict with the Penal Law, and, accordingly, this court intervenes.

The appointment of Dr. Russell is an insult to the people of the city of New York and to the thousands of teachers who were obligated upon their appointment to establish good moral character and to maintain it in order to keep their positions. Considering the instances in which immorality alone has been held to be sufficient basis for removal of a teacher, and mindful of the aphorism " As a man thinketh in his heart, so he is," the court holds that the acts of the board of higher education of the city of New York in appointing Dr. Russell to the department of philosophy of the City College of the City of New York, to be paid by public funds, is in effect establishing a chair of indecency and in doing so has acted arbitrarily, capriciously and in direct violation of the public health, safety and morals of the people and of the petitioner's rights herein, and the petitioner is entitled to an order revoking the appointment of the said Bertrand Russell and discharging him from his said position, and denying to him the rights and privileges and the powers appertaining to his appointment. Settle final order accordingly.