In the Matter of BOARD OF HIGHER EDUCATION OF THE CITY OF NEW YORK, Respondent, *v.* ELMER A. CARTER et al., Constituting the State Commission Against Discrimination, Appellants.

First Department, May 29, 1962.

*Henry Spitz* of counsel (*Solomon J. Heifetz* and *Joan Offner* with him on the brief), for appellants.

*David W. Peck* of counsel (*Morris Handel* and *Hugh J. O'Rourke* with him on the brief; *Leo A. Larkin, Corporation Counsel,* attorney), for respondent.

*Charles A. Brind, Jr.* (*John P. Jehu, Elizabeth M. Eastman, George B. Farrington* and *Louis H. J. Welch* with him on the brief), for Board of Regents of the University of the State of New York and another, *amici curiæ.*

*John J. Mullally* of counsel (*Lawrence P. Downes* and *Bernard J. McMahon* with him on the brief), for Ancient Order of Hibernians in America, *amicus curiæ.*

*Robert L. Carter* of counsel (*Jawn A. Sandifer* and *Maria L. Marcus* with him on the brief), for National Association for the Advancement of Colored People, *amicus curiæ.*

*Robert P. Whelan* of counsel (*Foley & Grainger,* attorneys), for Bay Ridge Catholic Action Guild, Inc., *amicus curiæ.*

*Thomas A. Bolan* of counsel (*Edward D. Burns* with him on the brief; *Saxe, Bacon & O'Shea,* attorneys), for Catholic Teachers Association of the Diocese of Brooklyn, Inc., *amicus curiæ.*

*Robert M. Benjamin* of counsel (*Frank E. Karelsen* and *Fred N. Fishman* with him on the brief), for Public Education Association, *amicus curiæ.*

*Per Curiam.* The State Commission for Human Rights (formerly the State Commission against Discrimination and hereinafter referred to as the Commission), being a State agency created by statute, has only such powers as are conferred upon it by the statute. Its powers, as so conferred, are twofold, namely, (first) powers in specific areas, to wit, the " power to eliminate and prevent discrimination in employment, in places of public accommodation, resort or amusement, in housing accommodations and in commercial space, because of race, creed, color or national origin " and (second) the general power " to take other actions against discrimination because of race, creed, color or national origin " as provided in article 15 of the Executive Law; and the Commission is expressly " given general jurisdiction and power for such purposes." (Executive Law, § 290.)

The special powers and duties of the Commission in the area of unlawful discrimination in employment are set out in sections 296 and 297 of the Executive Law. Such powers are declared to exist with respect to the unlawful discriminatory practices, as defined in section 296, of an employer, labor organization or employment agency. Thus, the Commission's power to proceed under these sections against the Board of Higher Education of the City of New York with respect to its employment practices is dependent upon the board's being an " employer " within the meaning of the statutory provisions.

By statutory definition, the said board is excluded from those employers subjected to the jurisdiction of the Commission under said sections 296 and 297. The board is a " body corporate ", educational in nature, and not organized for private profit. (Education Law, §§ 6201–6202.) Subdivision 5 of section 292 of the Executive Law expressly declares that the term " employer " does not include a " fraternal, charitable, educational or religious association or corporation, if such   *   *   * association or corporation is not organized for private profit ". Thus, by virtue of the express terms of the statute, the board is excluded from the special provisions thereof appertaining to an employer.

Furthermore, a review of the legislative history corroborates the fact that educational corporations, such as the board, were intended to be excluded from the purview of the provisions of sections 296 and 297 relating to unlawful discriminatory practices in employment.

In this connection, it appears that the State Board of Regents and the Commissioner of Education have long been vested with the full power and duty to take all necessary and proper action with respect to ethnic and religious discrimination in the public educational system, including with respect to any alleged discrimination in employment by Boards of Education, including the board here, subject to its jurisdiction. It appears from contemporaneous reports that the Legislature, at the time of the enactment of these provisions of the Executive Law, was well aware of the broad powers of the Regents and the State Commissioner in these matters. Logically, then, if these powers and duties of the Regents and State Commissioner were to be encroached upon or subjected to duplication at the hands of another public body, such as the Commission, we would find in the statute a clear expression of legislative intent to that effect. Certainly, in the absence of such expression, we should give effect to the plain terms of the statute which purport to exempt educational corporations, such as the board, from the application of the employer provisions thereof.

The exemption of the board, by virtue of the statutory definition, from those specific provisions of the statute having to do with the authority of the Commission over unlawful practices in employment by an '' employer '' would not, however, have the effect also of excluding the board from the application of the independent provisions of the statute conferring further general jurisdiction upon the Commission '' to take other actions against discrimination '', wherever it exists, with the related powers enumerated in said article 15.

Included within this further general jurisdiction of the Commission, is the power and duty '' [t]o create such advisory agencies and conciliation councils, local, regional or State-wide, as in its judgment will aid in effectuating the purposes of this article [article 15 of the Executive Law] and of section eleven of article one of the constitution of this state, and the commission may empower them to study the problems of discrimination in all or specific fields of human relationships or in specific instances of discrimination because of race, creed, color or national origin, and to foster through community effort or otherwise good-will, cooperation and conciliation among the groups and elements of the population of the state, and make recommendations to the commission for the development of policies

and procedures in general and in specific instances, and for programs of formal and informal education which the commission may recommend to the appropriate state agency." (Executive Law, § 295, subd. 8.)

It is true that the provisions of the statute are that the Commission shall create " advisory agencies and conciliation councils " to carry out the powers mentioned in said subdivision 8. But such agencies and councils would merely be agents or arms of the Commission; and inasmuch as their powers stem only from the Commission and their existence rests within its discretion, it is inferable, in the context of this statute, that the Commission itself may undertake these activities which it may entrust to agencies and councils.

Furthermore, the Commission is expressly given the power and duty " [t]o issue such publications and such results of investigations and research as in its judgment will tend to promote good-will and minimize or eliminate discrimination because of race, creed, color or national origin " and " [t]o render each year to the governor and to the legislature a full written report of all its activities and of its recommendations." (Executive Law, § 295, subds. 9, 10.)

The provisions of the statute should be construed and applied liberally to accomplish the purposes thereof. (See Executive Law, § 300.) Surely, to exclude the board, and in effect all affairs of the public school system from the general powers of the Commission in the field of discrimination runs contrary to the general purpose of the law, including, among other purposes, the elimination of discrimination " by the state or any agency or subdivision of the state ". (See N. Y. Const., art. I, § 11.) Moreover, the unquestioned assertion of jurisdiction by the Commission for a period of over 15 years in the matter of investigation, study, recommendations and conciliation efforts to eliminate discrimination in the field of public employment, including in employment in educational institutions under the control of the State Board of Regents, lends great weight to support the interpretation of the statute to confer upon the Commission the power to proceed with respect to such institutions as provided for by subdivisions 8, 9 and 10 of section 295 of the Executive Law. (See *Matter of Otis* v. *Board of Higher Educ. of City of N. Y.*, 199 Misc. 157, affd. 277 App. Div. 1035, affd. 302 N. Y. 740.)

The final order, entered March 28, 1961, should be modified on the law and the facts, to delete the first, third, fourth and fifth ordering paragraphs thereof, and in lieu thereof to provide that the Commission is further directed to refrain from taking

any action in the matter of alleged unlawful discriminatory practices in employment or promotion of faculty members at Queens College or at any other educational unit under the control and jurisdiction of the petitioner, the Board of Higher Education, excepting only such investigations, studies, recommendations, programs, conciliation efforts, reports and proceedings as are provided for by and in conformity with subdivisions 8, 9 and 10 of section 295 of the Executive Law; and, as so modified, the order should be affirmed, without costs.

STEVENS, J. (dissenting). Respondent State Commission against Discrimination (herein SCAD), now called the State Commission for Human Rights (L. 1962, ch. 165) appeals from a final order, entered March 28, 1961, granting petitioner's application made pursuant to article 78 of the Civil Practice Act. The order prohibits respondent from (1) asserting authority to exercise jurisdiction over petitioner (herein Board), with respect to its employment and promotion of faculty members at Queens College or any other educational unit under the Board's jurisdiction and (2) receiving, investigating, passing upon, or taking any other steps or procedures with respect to complaints alleging discriminatory practices as aforesaid. The order also directs a dismissal of all complaints, verified and unverified, pending and relating to such alleged practices and annuls resolutions, proceedings, investigations, determinations or findings theretofore made or conducted.

Since the question is solely one of law, any extended discussion of the facts, or the merit or lack of merit of the charges which led to this proceeding is unnecessary. The occasion for the institution of this proceeding resulted from the alleged existence of discriminatory practices at Queens College in the employment and promotion of faculty members and actions taken by SCAD in respect thereto.

On appeal SCAD urges that

(1) the remedy of prohibition will not lie against it;

(2) the Board is not an exempt employer within the meaning of the law;

(3) whether or not the Board is exempt, SCAD has the power to investigate and study problems of discrimination with respect to the Board and make recommendations thereon;

(4) SCAD's interpretation of the law is practical, has been followed for more than 15 years without judicial challenge and is therefore entitled to great weight;

(5) twelve of the 15 Commissions against Discrimination in the United States entertain jurisdiction over discriminatory employment practices by public educational institutions; and

(6) there was some concession of jurisdiction (later qualified) by counsel to the Board.

The Board contends that

(1) SCAD is without jurisdiction to conduct any investigation into faculty appointments;

(2) the Executive Law expressly excludes the Board from its jurisdiction over faculty appointments and promotions, subject only to the Board of Regents and the State Commissioner of Education;

(3) SCAD's claim of a practical construction of the law is without merit; and

(4) these article 78 proceedings are proper. The Board also asserts that SCAD cannot conduct even "informal investigations".

Thus a major question posed is whether the Board as an employer is exempt by the law from the jurisdiction and investigatory powers of SCAD, particularly with respect to alleged discriminatory practices in the employment or promotion of faculty members in educational units under the Board's supervision.

The contention of the Board that it is expressly excluded rests upon the language of the law (Executive Law, § 292, subd. 5) and the Board's nature and powers as set forth in certain provisions of the Education Law. Under the Education Law the Board, as constituted by law, is a "separate and distinct body corporate" with "the duties and powers of trustees of colleges", having sole control of the educational work in New York City of those institutions "of collegiate grade which leads to academic, technical and professional degrees", which institutions are a part of the common school system of the State (Education Law, § 6202; *Matter of Board of High Educ. of City of N. Y.* v. *Cole,* 176 Misc. 297, affd. 263 App. Div. 777, motion for reargument denied 263 App. Div. 917, affd. 288 N. Y. 607). The Board is an "entity separate and distinct from the Municipality and is a State agency for carrying out the education policy of the City." (*Nelson* v. *Board of Higher Educ. of City of N. Y.,* 263 App. Div. 144, 149, affd. 288 N. Y. 649.)

Subdivision 5 of section 292 of the Executive Law provides: "5. The term 'employer' does not include a club exclusively social, or a fraternal, charitable, educational or religious association or corporation, if such club, association or corporation is not organized for private profit". The Board asserts that it is an educational corporation, not organized for private profit and therefore is excluded by the plain language of the statute. Whether the Board's position is correct depends upon a con-

struction of the statute as a whole, the legislative intent. and upon the nature, powers and duties of SCAD as set forth in the law. Some consideration must also be given to the expressed broad public policy of the State.

SCAD was created in 1945 by legislative act (L. 1945, ch. 118). Former section 125 of article 12 (now section 290 of article 15) of the Executive Law, among its stated purposes, declared the law to be deemed an "exercise of the police power of the state for the protection of the public welfare, health and peace of the people of this state, and in fulfillment of the provisions of the constitution of this state concerning civil rights; and the legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color or national origin are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." The original provisions of that section have been extended, not restricted, by recent legislation.

The provision of the Constitution above referred to expressly forbids discrimination on account of race, color, creed or religion "by any other person or by any firm, corporation, or institution, *or by the state or any agency or subdivision of the state.*" (N. Y. Const., art. I, § 11, emphasis supplied.) SCAD is empowered to formulate policies to effectuate the declared purposes and, additionally, "may make recommendations to agencies and officers of the state or local subdivisions of government in aid of such policies and purposes" (Executive Law, § 294). SCAD is also expressly empowered to "request and utilize the services of all governmental departments and agencies"; to "receive, investigate and pass upon complaints alleging discrimination in employment because of race, creed, color or national origin" (Executive Law, § 295, subds. 4, 6) in effectuating the declared purpose to "eliminate and prevent discrimination in employment * * * either by employers, labor organizations, employment agencies or other persons" (Executive Law, § 290). The affirmative duty is imposed upon SCAD to "render each year to the governor and to the legislature a full written report of all its activities *and of its recommendations*" (§ 295, subd. 10, emphasis supplied).

The Board is a part, and under the jurisdiction, of the State Education Department (Education Law, §§ 6201, 6202; cf. *Mark v. Board of Higher Educ. of City of N. Y.,* 303 N. Y. 154), which department is provided for in the Constitution (art. V, § 2), and is charged by law with "the general management and super-

vision of all public schools and all of the educational work of the state '' (Education Law, § 101). The institutions over which the Board presides are part of the common school system of the State (*Matter of Board of Higher Educ.* v. *Cole, supra*) and are subject to the visitation of Regents of the University (Education Law, § 6202), who are the heads of the Department of Education (N. Y. Const., art. V, § 4).

While there is no dispute that the Board is an employer, there may be some question whether it is a '' state agency '' within the meaning of the law. The term '' state agency '' has been defined in various laws as including any State department, or division, board, commission or bureau of any State department or agency of the State of New York (Public Officers Law, § 73, subd. 1; Executive Law, art. 18 [State Building Code Law], § 372). The Department of Education is clearly a State agency within the definitions given. The Board, though a separate corporation, is a part of the whole system of State education — partaking of the characteristics of the parent. It has been declared a State agency for carrying out the education policy of the city (*Nelson* v. *Board of Higher Educ.*, 263 App. Div. 144, 149, affd. 288 N. Y. 649, *supra*; *Lewis* v. *Board of Educ. of City of N. Y.*, 258 N. Y. 117).

Since the opportunity to obtain employment without discrimination because of race, creed, color or national origin is declared by statute to be a civil right (Executive Law, § 291); since the Constitution of the State of New York forbids discrimination as to civil rights by the State or any agency or subdivision of the State (art. I, § 11); and since the Law against Discrimination (Executive Law, § 290), *inter alia*, was enacted in fulfillment of the constitutional provision, with SCAD created to carry out the declared objective, it would seem that the Board as a State agency, by virtue of this language, would not be an exempt employer within the law. Indeed, the Attorney-General, in a formal opinion, declared that the '' Commission [SCAD] has jurisdiction over the State and its local subdivisions '' and '' the statute [law] was intended to apply to the State, its agencies and the subdivisions of the State.'' (1946, Atty. Gen. 82; see, also, Op. Atty. Gen., State of California, No. 61–19, April 20, 1962.)

If it be argued that there is an ambiguity by reason of the exclusion of nonprofit educational corporations (Executive Law, § 292, subd. 5), the answer might well be that such provision was intended to apply to educational organizations operated, supervised or controlled by or in connection with religious or denomi-

national organizations (cf. Executive Law, §§ 292, 296, as amd.; cf. Civil Rights Law, § 40) and not to the Board as a public institution, supported by public funds.

A reference to some of the " Comments on the Permanent State Agency Bill " (a discussion prior to the enactment of the law) might prove valuable. For when there is any doubt as to the meaning of a statute or the intent of the Legislature in passing it " recourse may be had to the records and journals of that body ". (*People ex rel. Fleming* v. *Dalton,* 158 N. Y. 175, 184.) Such records, while not binding on the court, may be persuasive on the question of legislative intent. (*Matter of Greenberg,* 141 Misc. 874, affd. 236 App. Div. 733, affd. 261 N. Y. 474.)

Referring to the term " employer " it was said: " 4. We have found no definition of the word ' employer ' as clear and comprehensive as the word itself in its accepted and dictionary meaning. The same may be said of the word ' employee '. In view of the inclusiveness of the word ' employer ', and in view of the fact that Section 11, Article I, of the state Constitution mentions not only private persons but also ' the state or agency or subdivision of the state ', employment by government is covered." (N. Y. Legis. Doc., 1945, No. 6, p. 28.)

Under the heading " Education " it was noted that SCAD is to study the problems of discrimination " and to commend to the appropriate state agency programs for formal and informal education against prejudice and discrimination. Chief among these agencies of government is the great Department of Education." (*Ibid,* p. 40.) Obviously the Department of Education and its agencies were intended to be included when the law was drafted.

" It is a fundamental rule of statutory interpretation that of two constructions which might be placed upon an ambiguous statute one which would cause objectionable consequences is to be avoided. The Legislature is presumed to have intended that good will result from its laws, and a bad result suggests a wrong interpretation. Thus, while consequences cannot alter statutes, they may help fix their meaning, and courts are not bound to close their eyes to them. Where possible a statute will not be construed so as to lead to evil, unjust, oppressive, or absurd consequences or to self contradiction." (McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 141.)

If the Board and the institutions its operates are exempt from SCAD's scrutiny or its investigatory powers, SCAD cannot make informed or intelligent recommendations to the Board, nor can it capably perform its duty to make recommendations to the Governor and to the Legislature. An exercise in futility

and absurdity would be recommendations based on simple abstractions.

The Board's nonexempt status as an agency of the State takes precedence over any claimed exemption as an employer by reason of its nonprofit education corporate character. Since the law is an exercise of the police power and the Board is supported by public funds, it was never intended to be an exempt employer within the meaning of subdivision 5 of section 292. Thus construed the provisions of the law and the Constitution are in complete harmony and the broad policy of the State enunciated both in the law and the Constitution are advanced. It has been held that even in faculty employment the Board may not act arbitrarily in disregard of law (cf. *Matter of Kay* v. *Board of Higher Educ. of City of N. Y.,* 173 Misc. 943, affd. 259 App. Div. 879, motion for leave to appeal denied 259 App. Div. 1000, motion for leave to appeal denied 284 N. Y. 578). (The case cited did not involve discrimination in employment.)

Since this case involves the construction of a statute, it was not intended that either the Regents or the Commissioner of Education should have sole and exclusive jurisdiction — especially so in matters involving basic civil rights (*Matter of O'Connor* v. *Emerson,* 196 App. Div. 807, 810, affd. 232 N. Y. 561).

Further, it is not essential that a complaint be filed by an individual before proceedings may be instituted. The Attorney-General or the Industrial Commissioner may now file verified complaints, and even an employer may seek the assistance of SCAD (§ 297). This indicates a legislative intent to broaden, rather than restrict, SCAD's jurisdiction to institute formal action. Certainly the Board falls within the scope of such proceedings.

Another question is whether SCAD may conduct so-called "informal investigations" for the purpose of study and recommendations without the receipt of a formal complaint.

Among its general powers and duties, SCAD has the powers:

"5. To adopt, promulgate, amend and rescind suitable rules and regulations to carry out the provisions of this article * * *.

"8. To create such advisory agencies and conciliation councils, local, regional and state-wide, as in its judgment will aid in effectuating the purposes of this article *and of section eleven of article one of the constitution of this state,* and the commission may empower them to study the problems of discrimination in all or specific fields of human relationships or in specific instances of discrimination.

" 9. To issue such publications and such results of investigations and research as in its judgment will tend to promote goodwill and minimize or eliminate discrimination because of race, creed, color or national origin." (Executive Law, § 295, emphasis supplied.)

Both the law and the rules enacted pursuant to the Law against Discrimination make reference to the power of SCAD to receive and act upon complaints. Unless it be held that such references by implication preclude informal investigations by SCAD on its own initiative, there is no merit to the Board's contention that SCAD lacks the power to do so. In subdivision 8 of section 295, above referred to, SCAD is expressly empowered to create advisory agencies and conciliation councils to study discrimination " in all or specific fields of human relationships ". It may reasonably be inferred in this case, considering the generally conciliation purposes of the agency, that what SCAD may do through others it may do directly. Moreover, SCAD's jurisdiction has been extended by the Legislature beyond the field of employment to include discriminatory practices in admissions and use of facilities by places of public accommodation, resort or amusement (Executive Law, § 296, subd. 2; L. 1952, chs. 284, 285) — an indication of the legislative intent to move forward on all fronts to eliminate evils of discrimination. Once it has been established that a facility or agency is subject to the jurisdiction of SCAD, to hold that SCAD may proceed only upon the filing of a verified complaint is to restrict and hamper unduly the operations of SCAD in its efforts to attain the expressed public goal of elimination of discrimination in employment and other areas. Certainly such informal investigations carry no enforcement powers but extend, at most, to study and recommendations. In certain areas, possibly including education, this may be a most desirable objective and, indeed, would seem to be clearly authorized (Executive Law, § 295, subds. 8, 9; § 294). Moreover, the fact that SCAD has acted to conduct informal investigations and studies over almost the total period of its existence without judicial challenge (including some involving State, municipal, county and local governmental agencies and the field of education) is entitled to great weight as a practical construction by SCAD of its powers under the statute (cf. *Matter of Otis* v. *Board of Higher Educ. of City of N. Y.*, 199 Misc. 157, affd. 277 App. Div. 1035, affd. 302 N. Y. 740; *Lightbody* v. *Russell,* 293 N. Y. 492).

There may be some question as to whether an article 78 proceeding is the proper vehicle to invoke judicial aid at this stage of SCAD's investigation since there had been no final public

determination and SCAD was exercising purely administrative or investigatory functions (cf. *People ex rel. Bender* v. *Milliken,* 185 N. Y. 35; *Matter of Zelter* v. *Nash,* 285 App. Div. 1214; see, also, *Matter of Hogan* v. *Court of Gen. Sessions,* 296 N. Y. 1). However, jurisdiction has been accepted by this court.

For the reasons stated, I dissent and vote to reverse and vacate the order appealed from, and would hold that the Board is not an exempt employer within the meaning of the law, and that informal investigations may be undertaken by SCAD.

STEUER, J. (dissenting). In expressing contrary views to what has been determined, I shall endeavor not to go over ground that has already been covered. There are two issues in the case: Has SCAD jurisdiction over the board and, if so, what is the extent of its powers. There is complete agreement that the board is a State agency and that SCAD has jurisdiction over State agencies. That the board is a State agency has been amply demonstrated in the dissenting opinion. With the second proposition, I am constrained to agree, despite certain pragmatic difficulties that must eventuate from the logical extension of the proposition, as well as certain expressions in the statute itself. As it is necessary for the development of the argument, these difficulties are briefly developed.

The statute makes no exceptions as to what State agencies are to be embraced within the term " employer ", so all State agencies which hire personnel are included. SCAD's jurisdiction thus extends over the office of the Governor, the Legislature and the courts. Conceivably, SCAD could find that the Supreme Court had engaged in discriminatory practices and enter an order to desist. Then it would have to go to that court and seek to have the court enforce the order against itself. Similarly, SCAD could conceivably make a like finding against the State Legislature. And it would have to enforce it against the body which created it and can, at will, abolish it. These are among the pragmatic difficulties referred to. The expressions in the statute itself are the references to State agencies. Of these there are but two, of which only one is significant. In section 294 of the Executive Law, SCAD is empowered to " make recommendations to agencies and officers of the state " in aid of its purposes. Why give it the power to recommend when it already has the power to compel?

Despite these difficulties, the legislative history and the reasoning set out in the foregoing opinions compel acceptance of the proposition that State agencies are within SCAD's orbit. But we are asked, as the majority argues, to find that the Legislature excepted a single State agency from among all of them. That

exception is the Department of Education (or at least certain of its subdivisions). This is not one of the agencies for which an exception might be expected to be made because enforcement might be difficult or incompatible with our scheme of government. With these not excluded, surely it is to be expected that any exclusion of a State agency would be in such terms that it would be unmistakable. For such a finding the majority relies on three grounds.

First, there is the legislative history. There is no point in characterizing the fairly extensive matter that has been submitted in the form of legislative committee hearings and the like. Some of it does support the view taken by the majority. But it is far from conclusive and, to some minds, not even persuasive. In any event, it is not the abstract intention of the Legislature that governs but what the words they used reasonably mean (*Matter of Berson [Corsi]*, 283 App. Div. 190; *Matter of Pierse* v. *Zimmerman*, 255 App. Div. 708).

The second stated reason is that the State Board of Regents and the Commissioner of Education have long had the power to deal with discrimination practiced by any of the bodies subordinate to them, including this petitioner. This is a fact but not a reason. What State agency is not in the same position? What State agency has ever lacked the power to prevent its subordinates from engaging in discriminatory practices in the hiring of its employees? It is precisely to require them to exercise that power that SCAD was given jurisdiction over State agencies.

The third stated reason is the language exempting certain employers found in the statute (Executive Law, § 292, subd. 5 quoted in both the majority and dissenting opinions). Concededly, this exempts an educational association or corporation not organized for private profit. The kind of institution that this section refers to is amply described in the dissenting opinion. The majority believes that it also includes this petitioner because it is an educational corporation.

The statute delineating the powers and duties of the petitioner Board of Higher Education (Education Law, § 6202) describes it as a " body corporate ". This expression, which dates back to Blackstone (see 1 Blackstone, Comm., p. 468) is used by that learned authority interchangeably with the word " corporation ". It might be argued that the archaic expression is an indication that the institution created conforms to the original concept of a corporation — a body capable of possessing property but which property did not pass to the holder's heirs. Thus, the Archbishop of Canterbury, the Lord Mayor of London, etc. were

bodies corporate. Another interchangeable expression was "body politic" (see Blackstone, *op. cit.*). The argument loses force, however, when it is recalled that the Regents of the University of New York are designated a "corporation" (Education Law, § 201). Nevertheless, it is quite clear that in the use of the word "corporation" in the Executive Law a corporation such as the petitioner was not intended. It is practically everywhere held that the use of the word corporation in a statute includes only ordinary business corporations and does not apply to governmental entities (*Rosenstock* v. *City of New York,* 101 App. Div. 9; *Emes* v. *Fowler,* 43 Misc. 603; 1 Fletcher, Cyclopedia Corporations, p. 203; 43 C. J., Municipal Corporations, p. 72).*

Moreover, several of the various Boards of Education which are part of the Department of Education are not corporations. For example, Boards of Central School Districts (Education Law, § 1802) and of Intermediate School Districts (Education Law, § 1952) are not corporations, while boards in Union Free School Districts are corporations (§ 1701). Is it to be argued that the Executive Law was intended to apply to those bodies in this complex which are designated as corporations and not to those which are trustees? The question is rhetorical and it is quite obvious that the designation "corporation" in the Education Law is for administrative convenience, and the happenstance that it was employed in the designation of this petitioner is irrelevant on the question of whether it is to be exempted from the provisions of the Executive Law.

Lastly, the majority points out, in reaching the conclusion that SCAD has the right to follow certain activities in regard to the petitioner board, that SCAD's unchallenged exercise of jurisdiction over educational bodies should be given great weight. It is somewhat difficult to see why that weight should be so unevenly distributed. Apparently the formal practices of SCAD are of no weight at all in determining whether SCAD may proceed on formal complaint against such bodies. The record shows 74 such complaints processed against State educational institutions, of which seven were against this petitioner. These are given no weight in determining whether SCAD has jurisdiction to entertain formal complaints. If the weight of experience is "great" in other respects, how it happens to become weightless in this one connection is not explained.

---

* In other jurisdictions — U. S.: *Township of East Oakland* v. *Skinner* (94 U. S. 255); Colorado: *City of Boulder* v. *Stewardson* (67 Col. 582); Florida: *City of St. Petersburg* v. *Carter* (39 So. 2d 804 [Fla.]; Maine: *Chase* v. *Inhabitants of Town of Litchfield* (134 Me. 122); Mississippi: *Feemster* v. *City of Tupelo* (121 Miss. 733).

It is therefore concluded that petitioner is subject to SCAD's jurisdiction and the order should so indicate. Up to this point I am in accord with the views expressed by my brother STEVENS, but here I depart. The majority holds that SCAD lacks jurisdiction to initiate or entertain a formal complaint against the petitioner but may conduct other proceedings looking to conciliation or having for their purpose investigation. And in this Judge STEVENS agrees. I disagree, not because the petitioner is exempt but because I find in the statute no such powers.

Article 15 of the Executive Law has two significant sections in this connection: section 295, titled, "General powers and duties of commission", telling what SCAD may do; and section 297, headed "Procedure", telling how it may do it. It is not questioned, nor, I believe, open to question, that the procedure outlined in great detail is applicable only to proceedings initiated by formal complaint. So, if there are other powers, there is no procedure provided for them. My brethren put their reliance on the powers given SCAD in subdivisions 8, 9 and 10 of section 295.

Taking these in reverse order, subdivision 10 merely provides for a written report annually to the Governor and Legislature of SCAD's activities and recommendations. The duty to report activities cannot increase the scope of the activities to be reported.

Subdivision 9 gives the power to issue "such publications" and "such results of investigations" as will tend to eliminate discrimination. It is argued that unless it can investigate it is an empty power to permit it to publish the results of investigation. And so it is. But what investigations are referred to? The reference is to the prior subdivisions 6 and 8. The investigation provided for in subdivision 6 is one made in connection with the procedure following a formal complaint and hence does not enlarge the powers of SCAD. Subdivision 8 is quoted, as far as material, in the majority opinion. Concededly, it grants no powers at all to SCAD except to appoint advisory agencies and conciliation councils, to which the section does grant certain powers. The contention is that "it is fairly inferable" that if the agencies, being SCAD's creations, received any powers, SCAD also received them. The inference must be drawn from something and, from the absence of any stated source, leaves only the statute itself as the basis. By definition it is not the words of the statute because, if so, no inference need be invoked. So it must be the general tenor and spirit of the law. While this is a perfectly legitimate source, it is submitted that the only

fair inference to be drawn from it leads to an exactly opposite conclusion.

The statutory provisions on procedure (§ 297) are among the most detailed that can be found in this State on the subject of trials before administrative bodies. Among its more prominent and unusual features is the following: '' After the filing of any complaint, the chairman of the commission shall designate one of the commissioners to make * * * prompt investigation in connection therewith; and if such commissioner shall determine after such investigation that probable cause exists for crediting the allegations of the complaint, he shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion. The members of the commission and its staff shall not disclose what has transpired in the course of such endeavors.''

The reason for and the wisdom of this provision must become obvious on even very slight reflection, and it can be fairly said that it sets the tone for the manner in which the commission is to act. However, it is equally obvious, and all concerned agree, that these restrictions apply only to a procedure on a complaint. Is it a fair inference that SCAD can by-pass these restrictions by some other form of procedure in which the party claimed to be at fault is deprived of these safeguards? A business could easily be ruined and, in the case of a State agency, the officials involved could have their careers destroyed prior to any hearing if this statutory protection is eliminated. Is it even fairly inferable that a Legislature concerned to provide for protection in a formal hearing intended to dispense with it if SCAD proceeds, in a manner it calls informal, merely to investigate and persuade? Concededly, if it can so proceed there is no safeguard. It is submitted that the only fair inference is that the failure to give SCAD express power to do so was advised and that it has no such power.

Two possible arguments to the contrary require attention, though the length of this writing requires that the treatment be brief. First, why did the Legislature give the power to make informal, unrestricted investigations to organizations designated by SCAD if it did not give that power to SCAD itself? Presumably because any action taken by them would be understood to be without compelling force and would, in addition, lack the weight and prestige that action by the officially designated body would have. Situations might arise which in SCAD's judgment might be resolved more effectively by a resort to public opinion — as where a certain species of discrimination was a

phenomenon of a particular locality rather than the practice of any one employer. Incidentally, the record reveals no designations by SCAD pursuant to this section.

Secondly, SCAD does point out that it has proceeded informally in a great number of instances without objection and this indicates practical interpretation of the statute not lightly to be set aside. The fact is established and the conclusion usually follows. But a usurpation of power gains no right to recognition no matter how long it is suffered. Certain practices do not lend themselves to challenge. In an informal procedure there is nothing to resist. The question must be raised, as here, by affirmative action of the party aggrieved. In taking affirmative action, the employer must publish to the world the accusation against him. Most employers would prefer to avoid this necessity and do the best they can short of it. Under these circumstances, the absence of challenge is neither remarkable nor a strong indication that the commission's interpretation of the powers given it is warranted.

The order should be modified to allow respondent to process any existing or future complaint against petitioner, and, as so modified, affirmed.

BREITEL, J. P., McNALLY and EAGER, JJ., concur in *Per Curiam* opinion; STEVENS and STEUER, JJ., dissent in part in separate opinions.

Final order, entered on March 28, 1961, modified on the law and the facts, to delete the first, third, fourth and fifth ordering paragraphs thereof, and in lieu thereof to provide that the Commission is further directed to refrain from taking any action in the matter of alleged unlawful discriminatory practices in employment or promotion of faculty members at Queens College or at any other educational unit under the control and jurisdiction of the petitioner, the Board of Higher Education, excepting only such investigations, studies, recommendations, programs, conciliation efforts, reports and proceedings as are provided for by and in conformity with subdivisions 8, 9 and 10 of section 295 of the Executive Law; and, as so modified, affirmed, without costs. Settle order on notice.

